[No. 39235. En Banc. December 31, 1970.]

*In the Matter of the Estate of* M. JOSEPHINE REILLY, *Deceased.*
FRANCES REILLY ESTILL *et al., Respondents and Cross-appellants,* v. SISTERS OF CHARITY OF THE HOUSE OF
PROVIDENCE *et al., Appellants.**

*Reported in 479 P.2d 1.

*Bogle, Gates, Dobrin, Wakefield & Long,* by *Thomas L. Morrow* and *William M. Gingery, Wettrick, Toulouse, Lirhus & Hove,* by *George J. Toulouse, Jr.,* and *Orly J. Sorrel* (of *Nicolai, Montgomery & Sorrel*), for appellants.

*Ferguson & Burdell* (*W. Wesselhoeft,* of counsel) and *John R. Stair,* for respondents and cross-appellants.

DONWORTH, J.†—This is an appeal from a judgment entered July 25, 1966, by the superior court in a will contest in which the purported will of Miss M. Josephine Reilly executed May 8, 1964, was declared to be invalid because of lack of testamentary capacity and also undue influence.

In order to decide the important issues presented by this appeal, it is necessary to consider in some detail the back-

---

†Justice Donworth is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

ground of this controversy, the parties involved, and also the personal history of the testatrix.

The trial lasted 4 weeks. A total of some 60 witnesses testified. Of these, 12 testified by deposition and did not appear in court. Three other witnesses answered written interrogatories propounded to them. The statement of facts contains nearly 2,500 pages and shows that approximately 175 exhibits were admitted in evidence.

The testatrix (herein referred to as Miss Reilly) was born in Chicago in 1887. Her father, Dr. Joseph Reilly, was a prominent physician there. Her mother died shortly after her birth. From her early childhood Miss Reilly resided at No. 4922 Kenmore Avenue in Chicago with a Miss Barrington who was her friend and constant companion until Miss Barrington's death in Seattle in 1953.

Dr. Reilly maintained his office for the practice of medicine in another part of Chicago. He also had living quarters in that locality. It was his custom to be away from the Kenmore Avenue house except for weekends. After he retired from the active practice of medicine shortly before his death, he lived with his daughter continuously. He died in May, 1928.

Dr. Reilly had previously been married and divorced. That marriage produced a son, Frank C. Reilly, who was brought up in Philadelphia by his mother's family and did not reside in Chicago. He was the father of the contestants and also of their sister, Mrs. Glore. He died in 1945.

Miss Reilly was educated in private schools and spent a summer traveling in Europe. She was an accomplished musician and played both the harp and the piano. She also was thorough and accurate in keeping accounts of her investments, the annual net income produced thereby being approximately $35,000 per year.

Miss Reilly was quite secretive concerning her financial and personal affairs and seldom discussed such matters even with her close personal friends. All of the ladies who knew her well both in Chicago and Seattle testified that she had a strong mind and was not easily influenced. When she

had made up her mind to do something, according to the Greven sisters' deposition, her motto was "Do it now."

Attached to this opinion is an appendix listing witnesses who testified regarding Miss Reilly's personality and character, with a brief excerpt from the testimony of each.

After her father died in 1928, Miss Reilly and Miss Barrington continued to live in the Kenmore Avenue home until 1931, when they sold the house and went to San Diego. After living there a while they moved to Texas and later to Denver. In 1935 they came to Seattle where they lived at the Camlin Hotel.

After Miss Barrington died in 1953, Miss Reilly continued to live there alone. In the summer of 1963, she consulted Dr. Joseph J. Reilly of Seattle who was no relation to her or her deceased father, although the names of the two doctors were almost identical. Dr. Reilly had previously treated Miss Barrington and had met Miss Reilly in that connection. Dr. Reilly had treated Miss Reilly professionally in 1955 and 1959.

At the time in 1963 when she consulted Dr. Reilly, she had a swelling of the glands in her neck. He diagnosed this as Hodgkin's disease and called in Dr. Chism who operated on Miss Reilly at Providence Hospital. The pathological report showed malignant lymphoma. She was discharged from the hospital on September 6, 1963.

Miss Reilly returned to the Camlin Hotel, and on November 3 she fell in her room at night. Dr. Reilly saw her the next day and found that she had had a very serious episode, so he sent her to Providence Hospital by ambulance. The doctor diagnosed her fall as being caused either by a slight stroke or that the circulation of blood to the heart muscle had been impaired. Miss Reilly's condition improved and she wanted to go back to the Camlin. Dr. Reilly sent her to the Medical-Dental Building Hospital for a while. She was discharged on November 11. She was supposedly going to move from the Camlin to Mount Saint Vincent's on the following day, but she did not do so until January 7, 1964.

Dr. Reilly continued to see her frequently while she was

a guest at the home. His testimony as to her condition while in the home will be referred to later.

After her father's death, Frank C. Reilly, his son, who was a half brother to the testatrix and the father of the contestants, instituted an action against her in Chicago which is described at some length below.

The charitable corporation which was named as the sole legatee in Miss Reilly's will was incorporated more than 100 years ago by the Sisters of Charity, an order of Catholic nuns. The corporate name was the Sisters of Charity of the House of Providence in the Territory of Washington. After Washington became a state the words "now State" in parenthesis were added to the corporate name.

This corporation now owns and operates hospitals in every large city or town in the state. In 1924 it constructed St. Vincent's Home for the Aged in West Seattle and has operated it ever since. Recently it has been called Mount St. Vincent's Home.

While the home is known as a Catholic institution, it should be emphasized that the Corporation of the Catholic Archbishop of Seattle (a corporation sole), which owns all church properties in western Washington, has no legal interest in the home or in any other property owned by the charitable corporation.

### The Chicago Litigation

In considering the question of the naturalness of Miss Reilly's will, we should have in mind her experience with her half brother (the father of the contestants) when she was sued by him shortly after their own father (Dr. Joseph Reilly) died in Chicago in 1928. In his will Dr. Reilly bequeathed all his property to his two children (Miss Reilly and her half brother) in equal shares. On April 16, 1929, her half brother, Frank C. Reilly, filed in the Illinois State Court for Cook County a bill of complaint charging Miss Reilly with embezzling certain stocks belonging to their father's estate with intent to defraud the half brother of his one-half interest therein. This bill of complaint is some 14 pages in length and is too long to set forth herein. It was

alleged that said stocks were then of the value of more than $100,000. The complaint also contained detailed allegations regarding the misuse by Miss Reilly of the money in a joint bank account maintained by her and their father at the time of his death, and also stated that the Kenmore Avenue home in Chicago (which had stood in Miss Reilly's name for many years) really belonged to their father's estate. It was further alleged that during the last years of his life while Dr. Reilly was living with his daughter, he was senile and that Miss Reilly had control of his assets and dominated his affairs.

The prayer of the complaint was for an accounting by Miss Reilly with respect to these matters, that a receiver be appointed to take possession of the money and securities referred to, and that she be enjoined from transferring or otherwise disposing thereof.

Miss Reilly answered the bill of complaint filed by her half brother, denying most of the material allegations of the bill. Her answer was also about 14 pages in length. She alleged that the corporate stock referred to was given to her by their father during his lifetime, that the joint bank account consisted mostly of her own earnings, and that she had purchased the home on Kenmore Avenue with her own money. She specifically denied the existence of any fiduciary relationship with their father in connection with their father's property. She also denied that Dr. Reilly was senile prior to his death and alleged that she acted only as an errand boy in carrying out his instructions.

This litigation was eventually settled by Miss Reilly's paying her half brother $40,000. They each received $14,900 from their father's estate. She retained her ownership of the Chicago home and the securities (her net value thereof after the payment of $40,000 being about $60,000).

The effect of this litigation upon Miss Reilly is described in the deposition of the two Greven sisters who lived very near her home in Chicago. They saw her almost daily between 1917 and 1931 when Miss Reilly left Chicago for the West. Miss Adophine Greven testified as follows:

Q Did she make any statements concerning her rela-

tives while she was in Chicago? A Well, at that time, after her father died, she came to us and she was upset, but not overly so, as much as anyone would be upset when somebody contests the father's Will; she said to us, "I am in trouble", she said, "My half brother"—and that's the first time and only time we ever heard her mention a relative, "but my half brother is contesting my father's Will claiming that he had been unduly influenced and he claims half of the estate", and she said, "Help me pray that everything will turn out all right". That's the first time that she ever mentioned. Everybody thought that Josephine was the doctor's only child and then after a little while, she came back, I don't know how long or how short, but it was not a long time, she came back and said, "It has been settled out of Court", she said, "I paid him $40,000", and that's all she ever mentioned of the Will. Q Did she ever mention any cousins? DOROTHY GREVEN: No. A No.

Miss Florence Mollan, another neighbor and close friend of Miss Reilly who saw her daily in Chicago between 1924 and 1931, testified by deposition that when the litigation was pending Miss Reilly came to deponent's home "in great fear and terror" and "poured her heart out" to deponent and her mother. Regarding threats made to Miss Reilly by her half brother at that time Miss Mollan testified:

'A After the doctor died and the estate was being probated and settled, she came into us in great fear and terror. Q Yes? A That her half brother was suing her father's estate. Q Yes? A And she was in great trouble. Q Yes? A And she looked to us for solace and comfort and poured out her heart. Then we knew that he existed and that this was going on. . . . A I can only say that she said to my mother, "He told me he will see me begging from door to door." That I heard in my living room. Q And when was that? A At the same evening or afternoon, rather, that she came in and poured out her heart in this trouble.

Mrs. Teresa M. Power first met Miss Reilly the second day after the latter arrived in Seattle. They became well acquainted and saw each other at least once a week. In addition they talked on the telephone nearly every day when Miss Reilly was living at the Camlin Hotel. Mrs.

Power moved to Mount St. Vincent's prior to Miss Reilly's going there in January, 1964. Thereafter Mrs. Power[1] visited her several times daily until 4 days before Miss Reilly's death on June 4, 1964, which occurred while Mrs. Power was in Ellensburg visiting her daughter. Mrs. Power testified concerning Miss Reilly's statement about her half brother who was raised by his mother's relatives in Philadelphia as follows:

> And I don't know how often Josephine saw him, she never did say, but I remember she told me that she and he, after her father died, that she had met him and that he told her that he hoped that he would see the day that she would starve to death, and I think that was on account of the father leaving more money to her than to him. [NOTE: The last portion of the sentence was stricken by the court.]

In our opinion, the foregoing discussion of the litigation instituted by the half brother against Miss Reilly after the death of their father, in which he accused her of dishonesty in her handling of their father's property during the last years of his life, shows that she was deeply hurt and seriously disturbed by this episode. In addition, the litigation cost her $40,000, plus presumably substantial attorney's fees. It was an experience which a conscientious and meticulous young woman would not be likely to soon forget.

### MISS REILLY CONTEMPLATED CHANGING HER WILL

Many months prior to May 8, 1964, Miss Reilly had mentioned to several close friends that she might leave her estate to charity. Among the persons to whom she made such statements was Margaret Heily, who had met Miss Reilly about 15 years before. She met her through Mrs. Ethel Anderson, who asked Mrs. Heily to drive Miss Reilly to a meeting of the St. Vincent's Women's Auxiliary, of which they were all three members. Thereafter she met Miss Reilly approximately 16 times. About 1962, when the

---

[1]On March 16, 1964, Miss Reilly wrote to Grace McLane about her life at the home and referring to Mrs. Power said: "My beloved friend for twenty-eight years, Mrs. Wm. B. Power [Therese], and I, enjoy many outings and visits together."

witness was driving Miss Reilly and Mrs. Anderson home in her car from one of these meetings, Miss Reilly said:

Q And as I understand it, from what you said, she said, "I have a problem. I don't know whether to leave it to a charity or to some distant cousins," is that right? A "Distant cousins that I haven't seen or heard of for twenty-eight years, to let them fight over it or to leave it to a charity." Q She said, "A charity," is that correct? A "A charity." Q She didn't just say "charity"? A No.

Mrs. Anderson became acquainted with Miss Reilly about 1935 when Mrs. Anderson was president of the auxiliary. She testified that in October, 1963, she and her husband took Miss Reilly on an automobile trip to eastern Washington to see the colored leaves and to pick apples. During the trip Miss Reilly mentioned her problem as to how to leave her estate. Mrs. Anderson testified:

Q All right. Go right ahead. She was talking, Miss Reilly and your husband were talking back and forth. And what was said after the discussion of close relatives? A That we were very lucky, that she didn't have anybody, and she said of course she had distant cousins, and she was disturbed, she didn't know just how to handle her affairs, and she supposed she could leave it to those distant cousins, and let them fight over it, or leave it to charity. Q Had Miss Reilly at a prior time made any statement concerning her will? A Just about the same statement in about 1961, in the car. Q And who was present? A That was Miss Heily. Q And what was the occasion? A We were coming in from meeting, and Miss Heily was driving.

Mrs. Lucy Kalin, who was then the proprietor of the John Kalin Funeral Home in Seattle, had known Miss Reilly for over 25 years. In February, 1964, Miss Reilly was in the Cabrini Hospital for a few days because she had had pneumonia while at the home and needed hospital care. She sent for Mrs. Kalin to discuss funeral arrangements, a subject they had talked about many times over the years. Miss Reilly said she would like to complete the arrangements at that time and give Mrs. Kalin a check for the total expense, but Mrs. Kalin would not accept payment in advance.

On cross-examination Mrs. Kalin testified:

Q Now, you stated that she told you that she had no relatives? A You know, you ask questions when a person dies so you can fill out the death certificate. You ask them their name, their address, where they are born, their father's name, mother's maiden name, and then you come down to the relatives. And she looked right at me and she said, "None," so I wrote "None". Q She didn't tell you anything about her other relatives besides her father and mother? A Yes, she did. Q She told you about her brother? A She told me she had a half-brother. Q And did she tell you anything about whether or not her half-brother had any children? A Yes. She told me that her half-brother had a son and two daughters. Q Did she say that they were dead? A No. She did tell me that her half-brother was dead later on. Q But she did not tell you that the half-brother's son and two daughters were dead, did she? A No. Q Well, that statement that she made to you then was inconsistent with the time she said she had no relatives? A No. No, I wouldn't say that. Q Why isn't it inconsistent? A You know, sometimes you have relatives, they are not given to you by choice, and if you do not wish to claim them, that is your business. Q So if I understand you correctly, Mrs. Kalin, and correct me if I am wrong, there was one occasion when she told you that she, that her half-brother had a son and two daughters? A Yes. Q And there was another occasion when you asked her if she had any relatives, to which she answered "None"; is that a correct statement? A Now, may I explain how that statement was made? Q Please do. A All right. That was made for her funeral record. Q But there was another occasion that she told you about the half-brother with the son and two daughters? A Yes. It wasn't very pleasant, I can tell you that. Q Was it only one occasion when she told you about this nephew and the two nieces? A Yes. I never wanted to hear about it again. Q Why not? A Because it wasn't very nice, I didn't think. Q What wasn't very nice about the two nieces? A I am not saying anything about the children or about him or anything else, but we just don't like to hear family affairs. Q Oh. A Unpleasant things. We were in Miss Reilly's—do you want to hear how I happened to hear this? Q Sure. A We were in Miss Reilly's apartment. We were having tea, with Miss Barrington. Miss Reilly had played the

harp and Miss Barrington sang. I just don't recall the song that she sang. And they were two very sweet people. And we were sitting there visiting, and Miss Barrington stood up and she said, "Missy, tell the girls about the skeleton you have in the closet." Q Go ahead. A Well, we didn't know what was coming, so we just sat there. She said, "Well, I have a half-brother." She said, "I am the product of a second marriage, and I was a fly in my half-brother's ointment." She said, "He took our estate into court, tried to prove that my father was senile, and he didn't succeed." So I said, "Where is he now?" Well, she said, "He is married." She said, "My father provided for him, for his care and his education and started him in business." Q Is that all she said? A No. He said, after the court action, he said, "I would like to see you out in the street." How anybody could say anything to such a kind little person. Q And this is all she said, is that correct, on that occasion? A Yes. We didn't want to hear any more of that. She said, "He is married and he has three children, a boy and two girls." Q Now, this statement was made to the best of your recollection approximately when? A Well, I wouldn't know just what year it was made, but I'd say—well, we hadn't known her very long. Maybe, oh, maybe a couple of years. Q Miss Barrington was still living however, on that occasion? A Oh, definitely so. Q All right. Now, getting to Miss—A Miss Reilly was not the type that would ever say anything unkind about anybody.

It is undisputed that several months before her death Miss Reilly was considering making a new will entirely different from her wills of 1945 and 1954.[2]

Another change contemplated by Miss Reilly was the matter of the place of her burial. It had been her intention to be buried in Chicago in Mt. Olivet Cemetery where her parents were buried. Her 1954 will so directed. During her discussion with Mrs. Kalin she definitely stated to Mrs.

---

[2]On September 8, 1963, shortly after her discharge from Providence Hospital after her operation, Miss Reilly saw Mrs. Scott at a church breakfast at the Sacred Heart Church. She called Mrs. Scott aside and told her that she wanted to get her will taken care of so that there would be "no fuss" about it. Miss Reilly told Mrs. Scott that she wanted the Elfords to have her silver service and the Holy Names Sisters to have her harp. Mrs. Scott wrote down these instructions. (Ex. 153.) Miss Reilly said that she wanted to change her will.

Kalin that she wished to be buried in Calvary Cemetery in Seattle. Mrs. Kalin assured her that she could arrange for the burial there, although there were then very few graves remaining available in Calvary Cemetery. This was a distinct and significant change from the burial instructions contained in her prior will.

As shown by the testimony above quoted, Miss Reilly, prior to going to the home in January, 1964, had seriously considered leaving her estate to charity (or *a* charity) instead of willing it to "distant cousins" from whom she had not heard for 28 years.

### THE CONTESTANTS' CONTENTION THAT
### THE WILL WAS UNNATURAL

In Appendix C to contestants' brief there is set forth an enumeration of the five largest gifts which Miss Reilly gave to various Catholic institutions during the 4 years prior to her entering the home, and it is stated that in contrast during this period her gifts to the home amounted to only approximately 3 per cent of the total. Also stated are the amounts given the home in 1964 after she became a guest there, the total of which is considerably larger.

From this enumeration it is deduced that, until a fiduciary relationship was created between Miss Reilly and the home, there was no action by her which would indicate that the home was a significant natural object of her bounty.

We disagree that such fiduciary relationship ever existed. The trial court premised its holding that a fiduciary relationship existed between Miss Reilly and the Sisters of Charity on the fact that she had gone to the home to die, and that she was a helpless old woman without any close relatives or anyone who had any primary concern with her welfare other than the Sisters in the home. We are not convinced that the aforementioned factors emphasized by the trial court give rise to a fiduciary relationship, but, even assuming that they do, the undisputed evidence indicates she was anything but a helpless old woman without any friends while she was in the home. In fact, all her

close friends—both in Seattle and in Chicago—testified that she was very strong willed and always had definite ideas. (See appendix to this opinion.)

Furthermore, the trial court was incorrect when it said in its oral decision there was nobody with primary concern for her welfare except the Sisters. Mrs. Power (whom Miss Reilly referred to as her beloved friend of 28 years) was also a guest on the same floor and saw her every day while she was in the home, and Mrs. Nelson was there every evening. The Hugh Elfords saw her practically every Sunday both before and after she went to the home. They saw her for the last time on Sunday, May 24, which was 11 days before she died and 16 days after she executed her will. Mr. Elford testified that on that occasion Miss Reilly talked a little slower than previously but that mentally she was very sharp. She inquired about a slight injury to his knee which he had sustained a short time before. All this is entirely inconsistent with the court's description of a helpless old woman without any friends who had a primary concern with her welfare.

In our opinion, Miss Reilly's will was entirely a natural one under the circumstances which existed in May, 1964. Contestants contend that it is unnatural because she did not make any bequests to the various Catholic charities (other than the home) to whom she had given gifts during the preceding 3 years amounting to $23,000.

If the making of such bequests would have made the will a natural one, we are certain that the contestants would not agree with this theory, since they would still be in the same position that they are at present and would take nothing under the 1954 will. In other words, if Miss Reilly had made 10 or more bequests to Catholic charities (which would have disposed of her entire estate) instead of leaving it all to one such charity, it is incomprehensible that the contestants would regard such will as natural, since they would still receive nothing. *See In re Estate of Miller,* 10 Wn.2d 258, 116 P.2d 526 (1941).

It is undisputed that neither of the contestants nor their sister, Mrs. Glore, had succeeded in communicating with

Miss Reilly since their grandfather's funeral in May, 1928. After the funeral the two sisters and their parents all went to Miss Reilly's home on Kenmore Avenue in Chicago. At that time Miss Reilly received them pleasantly. This was before the dispute arose between their father and Miss Reilly, which culminated in the bitter litigation which he instituted in 1929.

Mrs. Estill, one of the contestants, testified that she mailed Christmas cards to Miss Reilly each year until one of them was returned to her marked "address unknown." This was about 1934. After that she looked in the Chicago telephone directory for Miss Reilly's name, but could not find it. Some 25 years later she and her husband were in Chicago. They drove to the Kenmore Avenue address and inquired about Miss Reilly but found no one who could give them any information as to where she had gone.

Mrs. Glore, a sister of Mrs. Estill, resides in Missoula, Montana, where her husband is a district judge. She answered interrogatories substantially to the same effect as the testimony of her sister, except she stated that she declined to join the contestants in the present action because "I was not desirous of being involved in a lawsuit."

John H. G. Reilly, a half brother of the two sisters above named, corresponded with Dr. Reilly, his grandfather, occasionally and visited with him when John was in Chicago— which was rather infrequently. The last visit was in 1927 when John and his wife were entertained by Dr. Reilly and John's half aunt, Miss Reilly. John never saw either of them again. He and his wife corresponded with Miss Reilly after 1927 until sometime prior to 1934, when she failed to answer their last letters.

John was a mining engineer (since retired) and he and his family lived in Mexico and later in Peru. John did not attend his grandfather's funeral because he was then in Mexico. In 1933 or 1934 John and his wife were in Chicago to attend the World's Fair. They went to the Kenmore Avenue house to inquire about Miss Reilly but were told by the occupant that she had moved to San Diego and that her address was unknown to him. During the past 34 years,

until he received notice of her death, John had no information regarding his half aunt.

We have stated in some detail the contacts which the contestants and Mrs. Glore had with Miss Reilly since the death of Dr. Reilly in 1928, because this matter has a bearing on the issue as to the naturalness of her will and what claim they had on her bounty.

Miss Reilly very infrequently mentioned the existence of the contestants, and then only to a few of her intimate friends. She referred to them several times as "distant cousins." When Mrs. Kalin was talking to her about funeral arrangements and getting information for her funeral record, Miss Reilly stated that she had no relatives. On another later occasion she, at the suggestion of Miss Barrington, told Mrs. Kalin about her half brother's bringing a lawsuit against her in Chicago regarding their father's estate. Miss Reilly also told Mrs. Kalin about her half brother's children (two of whom are contestants in the present action). Furthermore, when Miss Reilly entered the home as a guest and gave information for the record, she stated that she had no relatives.

The fact that Miss Reilly had executed wills in 1945 and 1954 in which the contestants were named as sole legatees is not controlling in this case. It is only one factor to be considered. Miss Reilly had a right (assuming her testamentary capacity and freedom from undue influence—subjects which are discussed below) to change her former will in any manner that she saw fit.

After Miss Reilly, more than 7 months prior to making her will, had stated to each of her three friends on separate occasions that she was considering changing her prior will and leaving her estate to charity (or to a charity) and after she had been a guest of the home for 4 months and had become familiar with the work that the Sisters were doing there for the elderly guests, there was nothing unnatural about her leaving her estate to the home. Just after the execution of the will she expressed (according to the deposition of the Sister Superior) her appreciation for all that had been done for her at Mount Saint Vincent's.

Miss Reilly planned to have her rosary service and funeral mass at Mount Saint Vincent's instead of her parish church. She had written to various friends after going to the home that she attended daily mass in the chapel on the third floor and that she was very happy being "under the roof with her God" and that the Sisters were so kind to her.

In view of the foregoing circumstances, we are of the opinion that the contestants' contention that Miss Reilly's will was unnatural is without merit.

The applicable rule is stated in *In re Estate of Miller*, 10 Wn.2d 258, 116 P.2d 526 (1941). See quotation therefrom on page 665, *infra*.

### The Testimony of Mrs. Clara Nelson

In concluding its oral decision the trial court referred to Mrs. Nelson's testimony (which she gave after Mr. Corrigan's death) that some 6 weeks after the will of May 8, 1964 was admitted to probate, she had a conversation with Mr. Corrigan, the attorney who drew the will and had been named as executor, which took place at Mrs. Nelson's place of employment in the County Office Building. Corrigan telephoned her that he was coming to see her. After they had talked together briefly, they had the following conversation:

> Q And what was the conversation between yourself and Mr. Corrigan? A Well, he wanted to know a little of Miss Reilly's background, and I told him. And then I said, "This is pretty shifty business." Q Who said that? A I said that to him, "This is pretty shifty business." I said, "You made out the will?" And he said, "I know it." And I said, "Do you expect trouble?" And he said, "I do."

The language "This is pretty shifty business." (referring to the execution of the new will) was Mrs. Nelson's characterization of the transaction. Corrigan said that he knew it but this was not an admission that he thought that the will was the product of undue influence nor that the testatrix lacked testamentary capacity.

The further affirmative answer by Corrigan to her ques-

tion: "Do you expect trouble?" adds nothing to the contestants' case. Since Corrigan at that time had qualified as executor, he knew the value of Miss Reilly's estate and of the provisions of her 1954 will. Any attorney who knew these facts would anticipate the likelihood of a will contest by the legatees named in the prior will. Furthermore, Miss Reilly—when the will was executed—told him that the half nephew and half nieces would be greatly disappointed in the new will and would cause trouble over it. Under these circumstances we do not think that Corrigan's answer can reasonably be construed as an admission that he had participated in legal trickery or a dishonest transaction.

■ As pointed out elsewhere in this opinion, the contestants had the burden of proving by clear, cogent, and convincing evidence that either the testatrix lacked testamentary capacity to make her will or that it was the product of undue influence by some other person.

The dissenting opinion quotes two sentences from *In re Estate of Kleinlein,* 59 Wn.2d 111, 366 P.2d 186 (1961), to the effect that this court's sole power is to ascertain whether the findings are supported by substantial evidence. We have no quarrel with this statement, but when read in context with the facts of *Kleinlein* it has no relevance to the issue before us. The statement was made in connection with consideration of the issue of testamentary capacity and must be read as a part of the further statement by the court that the findings by the trial court that the testatrix lacked testamentary capacity was

> abundantly supported by the proofs and, indeed, any other conclusion would be preposterous.
>
> . . .
>
> The autopsy confirmed the opinion of the attending physician that Mrs. Kleinlein suffered from senile dementia. The brain tissue had so far dissolved that only twenty-five per cent of the gray matter remained. The classical findings of senile dementia were confirmed by the *post mortem* examination.

*In re Estate of Kleinlein, supra* at 113.

■ Therefore, this court reached a proper result even

under the clear, cogent, and convincing test. Evidence which is "substantial" to support a preponderance may not be sufficient to support the clear, cogent, and convincing requirements with which we are faced.

The rules applicable to this case were recently stated by this court in *In re Estate of Smith,* 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124 (1966). There we quoted at length from *In re Estate of Martinson,* 29 Wn.2d 912, 190 P.2d 96 (1948); *Dean v. Jordan,* 194 Wash. 661, 79 P.2d 331 (1938); *In re Estate of Hansen,* 66 Wn.2d 166, 401 P.2d 866 (1965); and *In re Estate of Miller,* 10 Wn.2d 258, 116 P.2d 526 (1941). To quote from these decisions would extend this opinion beyond proper length, but their language should be applied to the present case. See also *In re Estate of Wiltzius,* 42 Wn.2d 149, 253 P.2d 954 (1953), where we said at page 151:

> In the *Bottger* case (p. 687), it was pointed out that a testator "does not have to be a literarian, a financial genius, an athlete, or an expert cook in order to qualify as possessing capacity to make a will."

Mrs. Nelson also testified at length concerning her long acquaintance with Miss Reilly which began about 20 years before her death when Miss Reilly was living at the Camlin Hotel. Their relations were originally social, but as time went on Mrs. Nelson began typing business letters for her. She described Miss Reilly as "very fastidious, meticulous. She was well educated and well traveled." Miss Reilly referred to the contestants as "the nieces and nephews in the East."

After Miss Barrington died in 1953, Miss Reilly had to live alone. Thus, about 2 years before she left the Camlin in January, 1964, she asked Mrs. Nelson to investigate rest homes where she could receive proper care. After Mrs. Nelson wrote a letter to a place in California and looked around Seattle, she discovered that Mount Saint Vincent had the only home with a chapel. Upon reporting this to Miss Reilly, Miss Reilly decided that this was the solution to her problem.

A few days before she moved in, Mrs. Nelson and her

husband drove Miss Reilly to Mount Saint Vincent to see if her room was ready. After going inside the home she expressed some doubt as to whether she was going to like it there.

After she did move in, Mrs. Nelson did practically all of her letter writing and personally deposited all of Miss Reilly's dividend checks in her bank account. Mrs. Nelson saw Miss Reilly frequently after she first moved to Mount Saint Vincent's and saw her every day from March 1st to the day of her death, June 4, 1964. During the first part of her stay at the home, Miss Reilly complained about her furniture and other things about the room that did not suit her. These matters were taken care of.

Mrs. Nelson recalled one evening when Dr. Reilly came to see Miss Reilly. She told him that she absolutely wanted to leave the home and asked where she could go. He patted her on the hand and nothing more was said on the subject.

On two occasions Miss Reilly told Mrs. Nelson that she wanted to move to *her* home. The latter suggestion was made following a Mother's Day party at the home, which was on May 10, 1964. Mrs. Nelson told her that such an arrangement would be impossible.

Parenthetically, it should be noted that this testimony is directly contrary to a great deal of evidence in the record to the effect that Miss Reilly was accorded the "red carpet" treatment when she moved into the home and during her stay there. There was testimony to the effect that she was the only guest who had ever been driven to the home with her baggage by the Sister Superior. There was also testimony to the effect that her every request was promptly granted and that the personnel employed on the third floor were instructed to treat Miss Reilly especially well.

In her correspondence with her friends in the East, Miss Reilly wrote about how pleased she was living at the home. Her letter of March 16, 1964, to Miss McLane includes the following: "The life here is holy and tranquil. Everyone is gracious. . . ." and "Our meals are delicious and of good variety." Four days later she wrote to the Greven sisters describing the furnishings in her room and

bath and said "My room is pleasant." Two weeks later she sent them a postcard stating that she had a beautiful view from her windows.

Miss Reilly told Mrs. Nelson about her having previously discussed with Mrs. Kalin her funeral arrangements, but that she had not heard from her. Miss Reilly asked Mrs. Nelson if she would take care of that matter, to which Mrs. Nelson consented. Mrs. Nelson investigated the expense of funerals and burials and made notes which were admitted into evidence. She reported to Miss Reilly in the early part of May 1964. Miss Reilly authorized her to go ahead and take care of everything. Mrs. Nelson said that she would need a power of attorney to act on Miss Reilly's behalf. So Miss Reilly executed a general power of attorney dated May 5, 1964, whereby she gave Mrs. Nelson authority to take care of all her business.

The evening of that same day Miss Reilly stated to Mrs. Nelson that she had available in the Denver bank $30,000 which she wished to have transferred to Seattle so that Mrs. Nelson could pay the expenses of special nurses and other expenses of her illness. At Mrs. Nelson's suggestion, Miss Reilly drew a check in that amount on the Denver bank and gave it to Mrs. Nelson to deposit in her account in the Seattle bank.

Miss Reilly also gave Mrs. Nelson a check payable to her for $5,000 to enable her and her husband to take a trip to the Holy Land, a matter which they had discussed many times. In fact, Miss Reilly had originally suggested their taking the trip.

On the same day Miss Reilly said to Mrs. Nelson:

A She said, "I have given the Sisters $5,000. Don't you think this is all right?" And I said, "I think it is very nice. You have been very generous with them."

On her way out of the building Mrs. Nelson met Sister Joseph (who was the registered nurse in charge of the third floor) and told her that Miss Reilly had given her a power of attorney. In response Sister Joseph said:

A And she said, well, she said, "You know, we have a project going on here, an experimental project, and in

the neighborhood of $14,000, and we need this money very badly, much more so than nieces and nephews." Q Whose nieces and nephews? A Well, we were referring to the nieces and nephews of Miss Reilly. Q What did you say in response to that statement by Sister Joseph? A I said nothing.

On May 7, 1964, Mrs. Nelson deposited the $30,000 Denver check in Miss Reilly's account.

On May 8th (which was the day Miss Reilly executed the will involved in this case) Mrs. Nelson and her husband attended a dinner party at the Rainier Club. Realizing that she would be delayed beyond her usual time of arrival at the home, Mrs. Nelson telephoned and asked for Sister Joseph. The nurse who answered told her:

"Sister Joseph can't come to the phone right now; she is busy with papers with Miss Reilly."

Mrs. Nelson asked the nurse to tell Sister Joseph that she would be late in getting to the home that evening.

Mrs. Nelson did arrive about 8:30 p.m. and went to Miss Reilly's room and had the following conversation with her:

A I just said, "Well, how are you tonight?" And she said, "Oh, my, am I exhausted," she said, "I have been signing papers all day. I don't know what I have signed. I hope I have signed the right thing," and I interrupted and said, "Miss Reilly, you have no business to be signing anything," I was quite firm about the statement. Q Why did you make such a statement? A Well, because I felt that if there was anything that she should be signing, I, she might tell me about it or I would know about it; I didn't see that she needed to be signing any important papers or any papers of any kind, for that matter. Q Incidentally, did anyone else come into the room that evening? A Miss Power came in shortly thereafter. I was only there a few minutes when Miss Power came in, and then I left.

## THE $30,000 COUNTER CHECK

On May 8, 1964 (prior to the execution of her will on the same day) Miss Reilly wrote out and signed the counter check for $30,000 payable to "Mt. St. Vincent, Seattle."

The trial court was of the opinion that the drafting and delivery of this check indicate a confused state of Miss

Reilly's mind. The trial court in its oral decision also concluded that the transfer of the funds from the Denver bank, which had been stated by Miss Reilly to Mrs. Nelson as being for another purpose, also showed her mental confusion and further stated that if she intended to leave her entire estate to the home, there was no point in making the $30,000 gift.

In our opinion, these conclusions are directly opposed to Miss Reilly's most outstanding traits of character. Her close friends (both in Chicago and in Seattle) testified that Miss Reilly was insistent that no one should know anything about her personal business. She discussed her business affairs with Mrs. Nelson, but only to the extent necessary for Mrs. Nelson to carry out her instructions. As Mrs. Nelson stated in her testimony, Miss Reilly confided in her "to a certain extent." She did not tell Mrs. Nelson the total value of her securities nor the amount of her annual income therefrom, but Mrs. Nelson assumed it to be substantial because she had typed some material for Miss Reilly's tax return.

For example, she disclosed to Mrs. Nelson the gift of $5,000 to the home, but withheld from her the true purpose of the transfer of the funds from the Denver bank which was arranged 2 days before the drawing of the counter check. Mrs. Nelson did not learn of the gift of the $30,000 counter check until it was canceled and returned by the bank shortly before Miss Reilly's death.

When Mrs. Nelson came to see her the evening of May 8th, Miss Reilly forestalled any inquiry as to precisely what papers she had signed that day by pretending not to know what she had signed. *Smith v. Keller,* 205 N.Y. 39, 98 N.E. 214 (1912).

Among the papers that she signed was the rug and mirror note. Miss Reilly had told Mrs. Power that Mrs. Nelson wanted the mirror, but that Miss Reilly wished to give her two vases instead. Obviously, Miss Reilly did not want to disclose to Mrs. Nelson the existence of the rug and mirror note at that time.

Although Mrs. Nelson continued to see Miss Reilly every

day from May 8th until her death on June 4th, and although Mrs. Nelson was certain that Miss Reilly recognized her each time, Mrs. Nelson never knew that Miss Reilly had made a will until she heard a rumor to that effect just before Miss Reilly's death. Mrs. Nelson had no information about the contents of the will until after it was probated and she read it in the county clerk's office.

As pointed out above, in the trial court's oral decision the conclusion is stated that the writing of the $30,000 counter check and of the so-called rug and mirror note were totally inconsistent acts with the making of a will leaving everything to the home. It did not make sense to do these three things on the same day.

We do not think that the court's conclusion is justified under the circumstances referred to. The purpose which Miss Reilly had in giving the $30,000 check was to enable the Sisters to enlarge the occupational therapy department of the home *right then*—not after a probate proceeding (and as it turned out, after a 5-year will contest). The minutes of the meeting of Mount St. Vincent Auxiliary (of which Miss Reilly had been a member for many years prior to living in the home) held September 18, 1962, include a discussion of this department which concludes: "Sister hopes to have a new therapy department on first floor very soon."[3]

In our opinion, these facts support the conclusion that Miss Reilly had testamentary capacity on May 8 and that she had a consistent purpose to manage her own affairs

---

[3]It should be noted that the occupational therapy department was a major project for the elderly guests at the home. The photographs in evidence as Ex. 126 illustrate the many activities and interests in which it enables the guests to develop their talents. For the men there are woodworking equipment and facilities for leather work and ceramics. For the ladies there are sewing machines, ceramics, looms for weaving, sewing, knitting, tatting, etc. For both there are available physical therapy, recreational services, a library, a monthly movie, and various games.

Prior to November of 1964 the space available for this department was so inadequate that most of the equipment needed for these activities had to be kept in storage. After that time the area for these activities was enlarged so that all the needed equipment could be used.

herself. The ministerial authority which she vested in Mrs. Nelson was limited to depositing dividend checks, drawing checks to pay bills, and making funeral arrangements. Mrs. Nelson testified that she did not expect that Miss Reilly would name her as a legatee in her will. However, in view of their close business relationship (as stated in her testimony quoted above) she was disappointed in not being told about the gift of the counter check 'and the fact Miss Reilly had made a new will.

At this point we think it appropriate to review some of the decisions of this court relating to testamentary capacity and also undue influence in relation to the making of wills.

■■ The applicable rules are stated in *In re Estate of Schafer,* 8 Wn.2d 517, 113 P.2d 41 (1941) as follows at page 519:

> In considering the testimony in this case, it may be well to have in mind certain well-established principles. The right to dispose of one's property by will is not only a valuable right, but one assured by law. *In re Phillip's Estate,* 193 Wash. 194, 74 P. (2d) 1015; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331. The rule in regard to testamentary capacity is that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate and which he intends to dispose of, and to recollect the objects of his bounty. *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *Dean v. Jordan, supra.*
>
> Where a will, rational on its face, is shown to have been executed in legal form, the law presumes testamentary capacity in the testator, and that the will speaks his wishes. *In re Hanson's Estate,* 87 Wash. 113, 151 Pac. 264; *In re Riley's Estate,* 163 Wash. 119, 300 Pac. 159. In order to overcome a will, the evidence must be cogent and convincing. *In re Johanson's Estate,* 178 Wash. 628, 35 P. (2d) 52.
>
> In order to vitiate a will, there must be something more than mere influence. There must have been undue influence *at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. Dean v. Jordan, supra,* and cases therein cited.

In *Dean v. Jordan, supra,* this court, while recognizing the rule that fraud or undue influence must be established by evidence that is clear, cogent, and convincing, stated that, nevertheless, certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument, the most important of such facts being: (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will.

. . .

On this point we quote from *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515, which has been cited in many of our cases, up to and including the *Jordan* case, *supra*:

"Mere suspicions are not sufficient to sustain the burden of proof which the law imposes upon the contestants. In the case of *In re McDevitt, supra* [95 Cal. 17, 30 Pac. 101], the court said:

" 'Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, *do more than raise a suspicion.* It must *amount to proof,* and *such evidence has the force of proof* only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.' " (Italics ours.)

■ A case very similar on its facts to the case at bar is *In re Estate of Miller,* 10 Wn.2d 258, 267, 116 P.2d 526 (1941) in which the testatrix had disinherited her son and also three grandchildren (whose mothers had predeceased her) because they had not visited her or written to her for many years. She left all her estate to three Catholic charitable institutions in Spokane in equal shares. The grandchildren instituted a contest to set aside the will on the

grounds of testamentary incompetence and undue influence of the beneficiaries. In a lengthy opinion this court affirmed the trial court in upholding the will. Concerning the naturalness of the will, this court stated the rule to be:

Whether a will is natural or unnatural is a question to be determined in each case as warranted by the facts. Mental incapacity on the part of a testator is not presumed on the theory that it was unnatural and unreasonable to execute a will giving all property to a stranger and cutting off one's kin. In the determination of the question what is unjust or unnatural, the history of the testator's family is to be considered and the moral equities and obligations appearing therefrom. A will is unnatural when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make. If the will is in accordance with such views, it is not unnatural however much it may differ from ordinary actions of men in similar circumstances. 68 C.J. 477.

When all of the facts are taken into consideration, surely it was perfectly natural for this mother and grandmother, who had not seen her children for more than twenty years, had only heard from them occasionally, and not at all during the last four years of her life, to refuse to devise or bequeath any of her estate to her grandchildren. Her daughters were dead, her sons-in-law had remarried, her son had ignored her since boyhood, and the grandchildren, with the exception of two of them when they were quite small, had never seen her.

The foregoing statement is applicable to Miss Reilly's situation. At the time she executed her will she had not heard from her half nephew and nieces for 28 years. They had no claim on her bounty. As above stated, she had paid their father $40,000 to settle his asserted charges of fraud and embezzlement on her part in connection with Dr. Reilly's estate.

Another case bearing upon the present problem is *In re Estate of Bottger*, 14 Wn.2d 676, 685, 129 P.2d 518 (1942), in which after citing the decisions referred to above regarding testamentary capacity this court said:

Those cases hold that a person is possessed of testamentary capacity if at the time he assumes to execute a

will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the testator lacked capacity to make a valid testamentary disposition of his property.

Furthermore, the cases above cited announce certain principles and lay down certain rules as guides to courts in determining the allocation of the burden of proof in such matters. The right to dispose of one's property by will is a valuable one, assured by law. Consequently, where a will, rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes. If the will has been probated and is thereafter contested, the burden of proving its illegality is, by statute (Rem. Rev. Stat., § 1387 [P. C. § 10019]), imposed upon the person contesting such probation, and, according to the above decisions, that burden can be met only by producing clear, cogent, and convincing evidence of the invalidity of the will.

See also *In re Estate of Schafer,* 8 Wn.2d 517, 113 P.2d 41 (1941), in which an 80-year-old but strong-minded widow in a hospital for surgery executed 3 wills in a period of 6 weeks, each drawn by a different attorney. In the third will she named but left nothing to her closest relatives, her sister and nieces whom she had not seen for 10 years. The principal beneficiary was a man whom the testatrix had only known for about 4 years. Their relationship was described in the opinion as being like that of mother and son. In a lengthy opinion this court upheld the will.

### The Medical Testimony

The *Bottger* case contains another statement that applies to the case before us. This relates to the medical witnesses. The testimony of the medical experts in the present case is too long and detailed to describe at length in this opinion.

The contestants' two medical witnesses had never seen Miss Reilly and based their opinions on the doctors' and nurses' records (the latter being incomplete because Mount Saint Vincent Home is not a hospital). They testified in answer to hypothetical questions that Miss Reilly, on that date she made her will, had severe dehydration or hypovolemia and this situation led to poor mentation. On cross-examination the contestants' medical experts admitted that their opinions were based either on incorrect assumptions or on incomplete facts. The legal requirements for making a will, to wit, that the testator must have sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty, were never stated to these medical experts. They theorized that she had "poor mentation" when she made the will. However, the trial court accepted their opinions regarding Miss Reilly's lack of testamentary capacity.

The contestants also called a psychiatrist, who had never seen Miss Reilly, who expressed the opinion based on the records that she had a schizoid-compulsive personality which broke down on May 8, 1964. On cross-examination his ability to diagnose the problems of a patient whom he had never seen was successfully attacked.

■ The statement from the *Bottger* case which is applicable here is:

> The physician witness testified that the testatrix was childish and that her memory was poor, but told of nothing she said or did which would sustain either conclusion. When interrogated as to her capacity to make a will on February 5, 1940, he gave an indirect answer to the effect that, like any other person, she had lost touch with outside affairs, was less acute mentally than when she was younger, and could not correctly comprehend business matters. Although he did not expressly say that she was incompetent, his testimony tends to that conclusion. But we agree with appellant that, although the witness is a physician, his testimony cannot be given added weight by calling it expert testimony as to decedent's mental condition. His only opportunities for observation were

two visits on dates far removed from that on which the will was executed and under abnormal conditions, the first one having been made immediately after the death of Mrs. Bottger's favorite son, and the second shortly before her own death.

Respondents' other medical witness never saw Mrs. Bottger at all. In response to a long hypothetical question propounded by respondents' counsel, which on its face called for an answer favorable to respondents, he testified that she was incompetent. *In cases of this kind, such evidence is of the weakest and most unsatisfactory sort. In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526.

(Italics ours.) *In re Estate of Bottger,* 14 Wn.2d at 693.

The two medical experts called by contestants did not indicate in their testimony that they knew the legal criteria for determining whether or not a testator had testamentary capacity as held in the *Bottger* case.

The proponent also called two medical experts, neither of whom had seen Miss Reilly in her lifetime. Dr. Charles P. Larson, a specialist in pathology and forensic pathology practicing in Tacoma, after reviewing the nurses' records at the home and Dr. Reilly's office records, testified that from these records alone he was unable to form an opinion as to Miss Reilly's mental competency on or about May 8, 1964, or whether she was suffering from hypovolemia at that time. He stated his reasons at some length. The second expert, Dr. Pirzio-Biroli, who specialized in general internal medicine, including hemotology, testified regarding that subject. He stated that he had examined the nurses' records in the home, Dr Reilly's notes, and also the hospital records relating to Miss Reilly's admission to Providence Hospital (twice in 1963), to Medical-Dental Hospital and Cabrini Hospital. After an exhaustive examination and discussion of Miss Reilly's symptoms at various times between January and May, 1964, Dr. Biroli testified that he could not determine whether or not she was suffering any marked degree of hypovolemia on May 8, 1964. He also stated that from the record he did not have any evidence that Miss Reilly's mental capacity deteriorated while at the home up to a few days before her death. Her behavior

pattern did not indicate to the witness that there was any such deterioration.

The remaining medical witness was Dr. Joseph J. Reilly, the attending physician. He was no relation to Miss Reilly, but had treated her professionally since 1955. He was 80 years old and had been practicing internal medicine since 1912; for the last 20 years in this state. He testified at length regarding Miss Reilly's several illnesses and her personal characteristics. After testifying regarding her various symptoms on May 4, 5, and 7, Dr. Reilly expressed the opinion that when he visited her on these days she was as alert as she ever was and could exercise her own judgments.

On cross-examination he was asked about certain alleged discrepancies in his office notes and the notes he made at the home concerning his patient's condition on various dates.

The trial court in its oral opinion stated regarding the attending physician's testimony:

Dr. Reilly, of course, was not there on the day in question, but the purport of his testimony was that from his seeing Miss Reilly the day before, and seeing her shortly thereafter, it was his conclusion that she must have been mentally competent to execute her will on that critical day.

Although I find much in Dr. Reilly to be admired, and I considered him to be a remarkable man, I must say that I viewed his notes with much skepticism. I felt that the office notes which he wrote at the time again, of the critical period in contrast with the notes which he had made at the Home, were highly suspect.

It seemed to me quite obvious that he had gone out of his way to make notations concerning "alertness," which were just simply not called for or appropriate upon the occasion for him making them in his office note, and in the dramatic contrast to the notes which he made in the records at the Home.

And I felt that on cross-examination, when asked one of the critical questions concerning his notes which referred to the fact that the patient had fallen numerous times and sustained numerous bruises, which tied in precisely with the analysis of the petitioners' physicians as

to the seriousness of the disease, I felt that his response and his explanation of these inconsistent notes was just not persuasive to me.

As this court pointed out in *In re Estate of Miller, supra,* when quoting with approval the language of the Supreme Court of California in *In re Estate of Collins,* 174 Cal. 663, 164 P. 1110 (1917), the testimony of expert witnesses as to a testator's mental condition which is based on hypothetical questions is the weakest and most unsatisfactory evidence.

The trial court had the power to evaluate the expert testimony as between the contestants' medical experts and the attending physician who had treated Miss Reilly during the last 9 years of her life.

However, in *Groff v. Department of Labor & Indus.,* 65 Wn.2d 35, 45, 395 P.2d 633 (1964) this court stated regarding the testimony of the attending physician vis-a-vis that of the examining physician:

> We are not saying that the trier of the facts should believe the testimony of the treating physician; the trier of the facts determines whom it will believe; but it should, in its findings, indicate that it recognizes that we have, in several cases, emphasized the fact that special consideration should be given to the opinion of the attending physician. [Citing cases.] If it elects to accept the testimony of the examining physician, there should be some indication why it is preferable to that of the attending physician.

In the present case the contestants' three medical experts were not even "examining" physicians. They had never seen Miss Reilly during her life or after her death.

The trial court's reasons for not accepting the testimony of the attending physician as to Miss Reilly's mental condition at the times he saw her both before and after the execution of the will are based largely on the difference between the record which he made at the home and his office record regarding her alertness.

■ The reasons stated by the trial court for rejecting the testimony of the attending physician seem weak and unconvincing. This is especially so when viewed in light of the above-mentioned authorities which indicate a marked

preference and regard for the testimony of the attending physician. We are of the opinion that the trial court should have ruled otherwise, but the constitution does not authorize this court to substitute its finding for that of the trial court. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). However, there was, in our opinion, a serious and prejudicial error committed by the trial court when on its own motion it, in effect, struck the entire depositions of the attorney who drafted and supervised the execution of Miss Reilly's will and the Sister Superior who was present at the time.

Contestants in their memorandum of additional authorities refer to the trial court's conclusion No. 3 to the effect that the testimony of Sister Joseph and Mr. Corrigan is unworthy of belief, and that of the Sister Superior and Dr. Reilly is so suspicious as to be entitled to little weight. They contend that in this case where oral and deposition testimony is in conflict, the trial court's conclusion as to the credibility of deposition witnesses is entitled to "peculiar weight."

█ At this point we refer to cases holding that, where deposition testimony is before an appellate court and the witness did not testify orally at the trial court, the latter's findings with respect to such testimony may be disregarded. This court so held in *Nygaard v. Department of Labor & Indus.*, 51 Wn.2d 659, 321 P.2d 257 (1958), and *Angelus v. Government Personnel Life Ins. Co.*, 51 Wn.2d 691, 321 P.2d 545 (1958). In such a situation the appellate court will determine from the deposition what findings should have been made. *Auger v. Shideler*, 23 Wn.2d 505, 161 P.2d 200 (1945). These cases are in accord with the general rule stated in 5A C.J.S. § 1660.

The deposition of Cadwell Corrigan insofar as it relates to the drafting and execution of Miss Reilly's will, in our opinion, contains nothing which would support a finding or conclusion that his testimony is unworthy of belief. Mr. Corrigan died from a heart ailment before the trial of this case, and hence he was not available to either party as a witness.

In his deposition he testified regarding his going to the home on May 8, 1964, at the telephone request of the Sister Superior, for the purpose of rendering legal service to the guest who had just made the $30,000 gift for the occupational therapy department. He testified in detail as to his interview with Miss Reilly regarding her making a new will and drafting and execution of it. Mrs. White (*then* an employee of the home) and he acted as attesting witnesses. Mr. Corrigan described Miss Reilly's mental condition at that time as follows:

A To me she was extremely alert; her voice was firm; her answers were responsive and intelligent; coherent. She knew everything that was transpiring there. Q Did you have an opportunity to observe what type of woman she was? A Yes. Q And what type would you say she was? A I would say that she was inclined to be domineering or bossy, and I base that upon the fact, somewhat, that when I asked the Sisters to leave the room she overruled me in no uncertain terms and asked them to remain.

On cross-examination Mr. Corrigan testified that he had been receiving a retainer of $50 per month from the home. His legal services consisted principally of answering writs of garnishment and advising the Sister Superior regarding labor problems involved in the operation of the home.

The trial court's reasons for not believing Mr. Corrigan's testimony in his deposition are stated in the oral opinion as follows:

Now, I allude to the fact that there was one other witness who could give direct evidence to refute the presumption; that would have to be Mr. Cadwell Corrigan. I would simply say that Mr. Corrigan's conduct, in the manner in which he produced this will, was so far below the minimal standards that have to be adhered to by an honorable lawyer practicing law, that his conduct requires no more comment than that.

His testimony, in my opinion, is not believable. The haste with which this instrument was drawn, with such haste that he not only didn't spell the name of Miss Reilly correctly, but he didn't even write in the name of the beneficiary correctly, the institution that he represented, and for whom he was on a retainer.

We agree with the trial court that Mr. Corrigan was careless in misspelling the names of the testatrix and the sole legatee in drafting the will, but, in our opinion, his poor draftsmanship does not render him incompetent as an attesting witness. He was present in Miss Reilly's room when she stated what disposition she wished to make of her property, what it consisted of, and where it was located. He read the will to her after it was drafted. He was in a position to observe the testatrix' demeanor and her statements regarding the will. He was also in a position to form an opinion as to her testamentary capacity and her mental alertness. His testimony in this regard is quoted above.

Miss Reilly's will had been admitted to probate before the institution of this contest. RCW 11.24.030 provides that under those circumstances the will is presumed to be valid, and the burden is upon the contestants to prove the contrary by clear, cogent, and convincing evidence. *In re Estate of Martinson,* 29 Wn.2d 912, 190 P.2d 96 (1948). We think that the trial court erred in refusing to consider Mr. Corrigan's testimony in his deposition. Neither, in our opinion, does the fact that Mr. Corrigan was receiving a small monthly retainer for answering writs of garnishment and giving routine legal advice to the Sisters disqualify him as an attesting witness to the will.

The other attesting witness to the will was Mrs. Caroline White, who at the time of the execution of the will was employed by the home as a general office worker. She saw Miss Reilly nearly every day while she was a guest at the home and spoke to her while taking the census each morning and chatted with her when meeting her in the corridors. Concerning Miss Reilly's personality she testified:

Q What impressions did you have of her as a personality? A Well she was a very—I don't know how to put it exactly. She left a strong impression on whoever met her. I am sure she was a strong-minded woman, forceful in her speaking.

Mrs. White described the conditions existing in Miss Reilly's room when she executed the will, and Mr. Corrigan and Mrs. White signed as attesting witnesses. She related

the conversation between Miss Reilly and Mr. Corrigan before the will was signed. She stated that Miss Reilly appeared to be perfectly clear mentally and seemed to be her usual self, although she was weak physically.

Mrs. White did not recall all the details concerning which she was cross-examined. The contents of the will were never discussed with Mrs. White.

Concerning the testimony of Mrs. White the trial court stated in its oral decision:

> Mrs. White, the lady who ran the elevator and who testified briefly that in her judgment, Miss Reilly seemed to be alert, I think we can dismiss because of the circumstances of her relationship to the Home, plus the fact that her opportunity to observe was so limited.

This statement seems to disregard Mrs. White's testimony that in March, 1965, she had taken a civil service examination for the position of clerk of the Seattle Municipal Court. About 3 weeks before the trial of this case she was notified that she had been appointed as clerk of the Municipal Court—Position I. She then gave the Sisters 2-weeks notice of her leaving the employ of the home. So at the time of the trial of this case, she was no longer an employee there. Therefore, at the time she gave her testimony she was no longer dependent on her employment at the home as a source of income to support herself and her four minor children.

If the trial court was under the impression in evaluating Mrs. White's credibility that she was still dependent on the home for a living, we think that the court was mistaken.

### The Evidence Relating to Alleged Undue Influence Is not Clear, Cogent, and Convincing

In our opinion there is no direct evidence that either Sister Joseph or the Sister Superior ever suggested to Miss Reilly what provisions her will should contain. Yet the trial court stated in its oral decision that the will which was knowingly executed by Miss Reilly was actually the will of Sister Joseph.

The testimony regarding the possibility of persuading

Miss Reilly to make a will does not show any undue influence by Sister Joseph or any other Sister. There is no testimony that anyone told Miss Reilly what the provisions of her will should contain.

There is no doubt that the Sisters hoped that Miss Reilly would leave something to the home, but there is no evidence that they attempted to unduly influence her as to what part of her estate she should bequeath to it.

The testimony is that before Miss Reilly became a guest in the home, Sister Joesph stated to some of the employees that a wealthy lady was coming there and that they should treat her well because she might leave something to the home. After Miss Reilly was living at the home similar statements were made to the employees.

The only evidence of a direct communication between Sister Joseph and Miss Reilly on this subject is that when she was going to the Cabrini Hospital in February, 1964, the Sister said to her: "Miss Reilly, you must make your will." This was repeated several times.

■ Mrs. Troxell, who was a practical nurse employed on the third floor, testified that Sister Joseph told her on another occasion that she thought that she would suggest to Miss Reilly and Mrs. Nelson that Miss Reilly should make out a will. About 2 weeks before her death, according to Mrs. Troxell, Sister Joseph said: "We finally got Miss Reilly to make out a will." This statement, unsupported by any evidence of undue influence, is insufficient to support the trial court's judgment. At most, the evidence in this case showed solicitation by the Sisters to make a will without even a suggestion as to what its provisions should be. Even where solicitation is made for a specified bequest, this does not constitute undue influence unless it be so importunate, persistent, coercive, or otherwise so operates to subdue the will of the testator and deprive him of freedom of action. Influence exerted merely by means of advice, argument, persuasion, solicitation, suggestion, or entreaty is no undue influence.

The trial court in its oral decision relied on the testimony of Father Galvin, the chaplain at the home, in holding that

Sister Joseph asked Miss Reilly for money or to make a will in favor of the home. Father Galvin was quite definite that, when Sister Joseph asked him to ask Miss Reilly to do so, Sister Joseph did *not* say that she had already asked Miss Reilly to do so. However, from the way she spoke Father Galvin inferred that she had done so.

Father Galvin was examined on this point on direct, cross and redirect examination. His testimony on direct examination was:

Q (By Mr. Wesselhoeft) My question is this: At any time did Sister Joseph tell you that she, Sister Joseph, asked Miss Reilly to leave money to the home in her will? A Well, in an indirect way by the way she spoke. Indirectly. She said, "Why don't you ask her?" That would mean she asked, do you see. Q Did she ever tell you that she herself had asked Miss Reilly? A She didn't come out and say, "I asked," not that way, but she said, "Well, why don't I ask her? We could do a lot of good." So I concluded she did ask it. . . . Q (By Mr. Wesselhoeft) Father, you have indicated that you had a conversation with Sister Joseph about Miss Reilly and a gift or a will. Would you state as accurately as you can what you recall that Sister Joseph said on that occasion? A Yes. "Why don't I ask her? We could do a lot of good with it." And I said, "Yes, you could," something along that line. That was the whole thing.

In our opinion, Father Galvin specifically declined to say that Sister Joseph admitted asking Miss Reilly for money or to make a will. He merely drew such inference from the way she spoke. His testimony does not support even a finding of solicitation to make a will, and of course could not be the basis for a finding of undue influence (which must be shown by clear, cogent, and convincing evidence). The foregoing discussion does not relate to evaluating the testimony of a witness; it relates to a complete failure of proof on a vital issue in the case.

Regarding the so-called "Ferguson note" we agree that Mr. Corrigan's failure to communicate with Miss Reilly, immediately upon receiving it, was inexcusable neglect on his part as an attorney, but, as stated above, his lack of effort to consult with Miss Reilly does not, in our opinion,

warrant the trial court's disregarding his entire testimony.

Nor do we agree that, even assuming that the note was written by Miss Reilly shortly after making her new will, this was evidence of a lack of testamentary capacity. At the time she was discussing the drafting of a new will with Mr. Corrigan she told him of her then existing will leaving everything to the contestants, which had been drawn up by Mr. Ferguson. Mr. Corrigan offered to telephone Mr. Ferguson right then but Miss Reilly vetoed the suggestion. She also told him that she wanted to leave her entire estate to the home and that it consisted almost entirely of securities which were in a safe deposit vault at the National Bank of Commerce, but did not tell him where the key was.

In the Ferguson note Miss Reilly stated Mr. Ferguson's office and home addresses and telephone numbers and further informed Mr. Corrigan (whom she had named as executor in her new will) that the key to the safe deposit box was carried on her key ring with other keys.

In our opinion, the sending of the Ferguson note to Mr. Corrigan does not indicate that Miss Reilly did not know what she was doing when she executed her new will a few hours earlier. On the contrary, we think that her doing so supports the opposite conclusion. Miss Reilly wrote the note to inform Mr. Corrigan further on matters pertaining to her will, such as the location of the keys, to aid him in performing his duties as executor and attorney. Such action is entirely inconsistent with that of a person who does not know what she is doing.

Another valid reason for not regarding the Ferguson note as tending to support respondents' contention that the sending of the note to Mr. Corrigan showed that Miss Reilly did not know that she had executed a new will is that the record is devoid of any evidence as to *when* the note was written. It is just as logical to assume that it was written several weeks or months prior to May 8 as to assume that Miss Reilly wrote it immediately after signing her will. It was undated, and handed to Sister Joseph by Miss Reilly in a sealed envelope which was not addressed. While the accompanying letter of transmittal written by

Sister Mary Priscilla to Mr. Corrigan was dated May 11, there is nothing to indicate when the enclosure was written by Miss Reilly.

In *In re Estate of Hansen*, 66 Wn.2d 166, 172, 401 P.2d 866 (1965), an 82-year-old widower had made a will leaving all of his property to the son of a deceased stepdaughter. Two months later he executed another will revoking prior wills and leaving his property to a neighbor lady who had started keeping house for him *1 day* before he made the second will. He died 2 months later. It was admitted to probate and later contested on the grounds of lack of testamentary capacity and undue influence. The trial court sustained the will and this court, after reviewing the evidence, affirmed stating:

> These circumstances, however, at best, give rise to no more than a mere suspicion of undue influence on the part of the housekeeper. They are as consistent with a theory that the will in question was the spontaneous, voluntary, and possibly spiteful act of Mr. Hansen, as with appellants' theory that the housekeeper exerted such an influence over Mr. Hansen, on July 1 and 2, 1962, as to overcome his freedom of choice and judgment.
>
> Mere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence. *In re Patterson's Estate*, 68 Wash. 377, 123 Pac. 515 (1912); *In re Bradley's Estate*, 187 Wash. 221, 59 P.2d 1129 (1936). Neither will mere suspicion, unaccompanied by evidentially supported implicating circumstances, give rise to a presumption of undue influence sufficient in strength to require rebuttal evidence.

In our opinion, practically all the witnesses who were well acquainted with Miss Reilly and saw her during the critical period involved in this case (May 4 to 9) testified in substance that, while she was seriously ill physically, she was mentally alert. Her mental capacity was adequate to make a will, *i.e.*, she knew what property she owned, the objects of her bounty and the disposition which she desired to make of her estate.

Regarding the issue of undue influence the evidence, in our opinion, shows that the only influence exerted was by

means of solicitations, suggestions, and entreaties *to make a will.* There is no evidence that Miss Reilly was told by anyone what provision or provisions her will should contain. Nor were the solicitations, suggestions, and entreaties so persistent and coercive as to subordinate her will and take away her freedom of action.

In *In re Estate of Martinson,* 29 Wn.2d 912, 914, 190 P.2d 96 (1948), we said:

> In order to have a will set aside on the grounds that its execution was produced by undue influence, it must be shown that the influence exerted was such as overcame the will of the testator. To put it in other words, the influence must have destroyed the free will of the testator so that the will spoke the intent and desire of the one exerting the influence, and not the intent and desire of the testator. *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47; *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964; and *In re Riley's Estate,* 163 Wash. 119, 300 Pac. 159.
>
> Legal definitions of the term "undue influence" cannot be given that will serve as a safe and reliable test for every case. Each case depends to a very large extent upon the facts presented to the court. However, not every influence exerted over a person can be denominated undue influence. Generally speaking, influence exerted by means of advice, arguments, persuasions, solicitations, suggestions, or entreaties, is not undue influence, unless it be so importunate, persistent, or coercive, or otherwise so operates as to subdue and subordinate the will of the testator and take away his freedom of action. *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515; *In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034; *In re Adams' Estate,* 120 Wash. 189, 206 Pac. 947; *In re Zelinsky's Estate,* 130 Wash. 165, 227 Pac. 507; and *In re Bottger's Estate, supra.*

See also *Converse v. Mix,* 63 Wash. 318, 115 P. 305 (1911).

Assuming arguendo that all of the factual testimony presented by contestants is true, still under the two cases above cited, in our opinion, it does not support a finding of undue influence on the part of the Sisters. As stated in our prior decisions, proof of solicitation, persuasion, suggestion, advice, or entreaties is not enough to warrant revoking the probate of a will on the ground of undue influence. Fur-

thermore, such influence must be proven by evidence that is clear, cogent, and convincing. All that contestants' evidence purports to show are acts of kindness on the part of the Sisters and suggestions and solicitation by them to Miss Reilly that she make a new will, the requested provisions of which were never stated to her.

Since the burden was upon the contestants to prove undue influence by evidence that is clear, cogent, and convincing, we are of the opinion that the evidence did not meet this standard and hence the judgment of the trial court should be reversed on the appeal.

We have already discussed the various alleged suspicious circumstances which under *Dean v. Jordan,* 194 Wash. 661, 79 P.2d 331 (1938), might shift the burden of proof to the proponent. But as stated in the *Dean* case (where the will was upheld) the existence of the presumption does not relieve the contestants of the duty to establish their contention of the existence of undue influence by clear, cogent, and convincing evidence.

As stated above, in our opinion, the contestants have failed to furnish the required quality of proof on this vital issue. Thus the burden of proof never shifted to the proponents, and the statutory presumption of the validity of the probated will is controlling. RCW 11.24.030.

There have been numerous cases involving will contests presented to this court during its existence but, so far as we are aware, there are only three cases in which wills were held void because of the presumption of undue influence.

As stated in *In re Estate of Smith,* 68 Wn.2d 145, 411 P.2d 879, 416 P.2d 124 (1966), at 154, those three cases are referred to as follows:

> In three opinions of this court (*In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034 (1912); *In re Jaaska's Estate,* 27 Wn.2d 433, 178 P.2d 321 (1947); *In re Ganjian's Estate,* 55 Wn.2d 360, 347 P.2d 891 (1959)), wills were held void because of a presumption of undue influence. In all three decisions, (a) the testator had little or no mental capacity; (b) the testator was greatly impaired physically; (c) the testator disinherited one near

and dear to him; and (d) the estate or a major portion thereof, was devised or bequeathed to one with whom the testator had no close ties.

For the reasons stated herein the judgment of the trial court is reversed with directions to dismiss the contestants' petition.

## The Cross-Appeal

Contestants have cross-appealed and have assigned as error certain portions of the judgment entered by the trial court July 25, 1966, revoking Miss Reilly's will dated May 8, 1964. They have also assigned error to specified portions of two orders entered subsequent to the judgment; namely, the orders of September 23, 1966, and April 7, 1967.

The effect of these orders is to award Richard J. Corrigan, formerly administrator de bonis non, reasonable attorney's fees and costs and disbursements for legal services performed by Bogle, Gates, Dobrin, Wakefield & Long in the trial court in connection with the will contest and directing the National Bank of Commerce, as administrator de bonis non, to forthwith pay the respective sums specified therein for the account of the former executor and administrator.

The order of April 7, 1967, also found that the former executor had in good faith performed his duties up to the time of his death and had undertaken to defend Miss Reilly's will in good faith. It fixed a reasonable sum to be paid to the executor's estate out of the Reilly estate for his services and those of his attorney.

This order of April 7, 1967, further found that Richard J. Corrigan, as administrator de bonis non, had in good faith performed his duties in this matter, that he had undertaken to defend Miss Reilly's will in good faith, and fixed reasonable compensation to be paid out of the estate for his services and for those of his attorney.

The objections filed by the contestants to final reports of the executor and administrator de bonis non were overruled.

When these orders were entered, the trial court had al-

ready entered its judgment which revoked and set aside the probate of Miss Reilly's will of May 8, 1964, and further decreed that her will was null and void.

In this posture of the case RCW 11.24.050 was applicable. This statute provided:

> If the probate be revoked or the will annulled, assessment of costs shall be in the discretion of the court. If the will be sustained, the court may assess the costs against the contestant, which costs may in the discretion of the court include a reasonable attorney's fee.

 Under the applicable decisions of this court applying this statute, such as *In re Estate of Klein*, 28 Wn.2d 456, 183 P.2d 518 (1947), the duty of the executor is to take all legitimate steps to uphold the testamentary instrument. If he does so in good faith, he is entitled to an allowance out of the estate for his costs and reasonable attorney fees necessarily incurred by him, regardless of whether or not he is successful in his defense against the contest of the will.

This court there held that the trial court had discretionary power in the premises and that the trial court had not abused its discretion in the assessment of costs or in the specific amounts allowed. Hence, the trial court in the present case did not err in its entry of the orders which the contestants assign as error on their cross-appeal.

It should be noted that the situation now before us is different than it was when the trial court entered the orders complained of.

This court by its majority opinion has reversed the judgment of the trial court decreeing that Miss Reilly's will was null and void and has directed the dismissal of contestants' petition contesting her will.

The case before us is now the same as *In re Estate of Mitchell*, 41 Wn.2d 326, 249 P.2d 385 (1952), in which, after reversing a similar decree, we said:

> Since the will is sustained, no award of costs in the superior court may be made to respondents [contestants]. *In re McKachney's Estate*, 143 Wash. 28, 254 Pac. 455; RCW 11.24.050.

Since respondents [contestants] appear to have acted in good faith and have made a *prima facie* showing of probable cause for contesting the will, costs in the superior court will not be assessed against them. *In re Chapman's Estate*, 133 Wash. 318, 233 Pac. 657.

Appellants are entitled to recover from the estate their costs and a reasonable attorney's fee to be fixed by the trial court.

Appellants will recover their costs on this appeal.

Accordingly, we affirm on the cross-appeal in the present case. It is so ordered.

ROSELLINI, HALE, NEILL, and STAFFORD, JJ., concur.

## APPENDIX

The following brief quotations are from the testimony of some of Miss Reilly's close friends who knew her either in Chicago or Seattle concerning her character and personality. A total of 11 witnesses testified regarding her personal traits.

Miss Florence M. Mollan, a friend of Miss Reilly since 1924, stated in her deposition:

Q How would you describe Josephine as a personality? A As a personality? Vivacious, sweet, cultured, precise, prim, sedate, cautious, very cautious, sharp, businesslike. Q Did she ever disclose to you her business or personal affairs? A No, she did not.

Mrs. Wm. B. Power, who saw her every day while at the home, stated:

Q During all the time that you have known Miss Reilly and particularly at the time that you saw her at Mount St. Vincent's, what was the state of her mind? A Perfect. She still attended to her own business, and her mind was just perfect. She didn't—strong. And as I always said, her mind was a mind of a man because she was just so—everything was strong. Q How would you further describe her, if you can? A Well, she was very feminine, but had this very strong mind. And her life was just circled around business.

. . .

Q Now, when you spoke of her business, what kind of business was she engaged in? A She attended to everything, her banking and her checking and whatever she had, and I don't know, because she never talked to me about things. She was, as I told you, she was so close, she was so close-mouthed that she didn't talk. Q Was she a meticulous person? A Yes, very. Very tidy and nice.

Mrs. Clara Nelson, who assisted in her business transactions, stated:

Q Now, with respect to Miss Reilly's personality and character, how would you describe her? A She was very fastidious, meticulous. She was well educated and well traveled. Q Was she a lady of

— A Precise. Q A lady who tended to follow routines or irregular in her ways? A No, I would say she followed routine.

Mrs. Lucy Kalin stated:

Q (By Mr. Morrow) How would you describe Miss Reilly, Mrs. Kalin? A As a person? Q Yes, as a person. A She was very kind and very gentle, and on the delicate type. And she was very precise in everything she did, and she definitely did her own thinking. People did not make up her mind about anything.

Mrs. Margaret Heily stated:

Q What type of a woman was Miss Reilly? A Very forthright. Very alert. Very definite in her opinions. Really a remarkable woman for her age.

Hugh Elford, who with his wife saw her every Sunday, stated:

Q During the period of years that you had known Miss Reilly what type of a woman would you describe her to be? A Well, in my opinion she seemed to be awful sharp. She was always up on all the latest things in the papers. She could discuss them very well. I am not too much on politics but she seemed to be very much up on that. She was terrific in music. Every time she came in the house she played the piano. She would play several pieces. I never once saw her use a sheet of music. So I would classify her as very intelligent and sharp.

Mrs. Anderson stated:

A She knew what she wanted to say. She told you what she wanted. She did not care for questions. You accepted whatever she told you, and that was it. Q What type of person was she in connection with paying attention to detail? A She was very, very strict in that. And I really don't know how to put it.

Mrs. Ames stated:

Q Was she the sort of person who would be likely to postpone handling of business matters, or would she be inclined to get busy and get them done? A Well, I think that she believed in taking care of things when it was necessary to do them. She didn't dally or procrastinate, surely not. She was a decisive person, that's for sure.

. . .

One thing I could never imagine her being influenced by anybody. If she made up her mind what was the right thing for her to do, somebody trying to talk her out of it wouldn't get anywhere. She just wouldn't . . .

. . .

Q Was this her character all the way along, as you knew it? A Always, yes. She was very certain of herself, a very decisive person, well able to handle her affairs.

Miss McNulty stated:

Q How would you describe her as to whether or not she was a

strong willed and determined person or weak in character? A Well, she was very strong in this manner, that she made her own decisions and certainly was the mistress of the home to which she came when she left the academy and which she carried on all the years that she lived there on Kenmore, but whether she lived in San Diego or lived at the Camlin, that was her home and she made her decisions; nobody else made them for her.

. . .

Q How would you describe Miss Reilly, as a person who told or did not tell about her personal affairs? A Miss Reilly felt that her personal affairs were nobody else's business. Q Yes? A And if anyone would ask her something that she felt was her business, she would very politely but briefly say that she didn't feel that that was your business. Q Do you know whether or not this was a characteristic of hers that was generally known to most of her friends? A I think so.

. . .

Q Do you have any opinion as to whether your friend, M. Josephine Reilly, was a person and a personality who could be easily influenced? A No, I do not believe that she could be. Q And why do you say that? A Because she had been her own mistress from the day that she left the Academy. She had been used to making her own decisions, and that if she was asking anybody for advice, it was so she would know both sides or all sides of a matter before she would make her own decision, but it was her own decision that she made.

Dr. Joseph Reilly, her attending physician, stated:

Q (By Mr. Morrow) Dr. Reilly, you indicated in your previous testimony that Miss Reilly was an individual. What do you mean by "an individual"? In what way was she an individual? A She was an individual in the sense that she did practically everything her own way. She didn't follow a pattern that if you give a solution, all right. She would never right off say "All right" to any suggestion that you would offer. She would consider that first and decide for herself whether it was wise to follow that suggestion. Q What kind of a personality would you describe her as having, Doctor? A I would say individual. That is a broad term. Alert. Dominant, you might say. Very courteous. And the amenities she observed to the letter of the law, you might say.

. . .

Q Doctor, did she ever indicate to you whether or not she was a determined person? A Yes, she did. Q In what way? A I mean her very attitude, her emphatic speech, her finality of expression. "That is the way it is done and that is the way I am going to do it."

. . .

Q Now, what was there about Miss Reilly's manner or activities on the 4th of May that prompted you to choose the words "emotionally unreasonable" in contrast to just plain "individual"? A Probably I was a little exasperated myself because she was quite

sick and I thought that she should avail herself of more adequate care in a hospital, and she refused that.

FINLEY, J. (dissenting)—Certainly it can be said that it is the policy of the law to uphold wills. However, the majority, in essence, embraces this hornbook generality as the exclusive and ultimate panacea for this will contest. Indeed, its virtues are elaborated fastidiously and at great length, without recognizing its deceptive oversimplification. Furthermore, this is without recognizing that not just one —but three—wills meeting all of the formal requisites as to execution are involved in this will contest.

Unquestionably there is a countervailing and, in my judgment, a functionally more critical legal principle or policy involved in this or any will contest. Namely, the law *does not* uphold and *does* void wills which do not represent the genuine testamentary intent of the deceased. But, again, this countervailing or conflicting principle is a generality. Neither it nor the first-mentioned one standing alone can solve a will contest. In other words, the courts seldom, if ever, solve any legal problems or controversies without engaging in a process of fact gathering and fact interpretation or evaluation. Apropos of this, the phrase—ascertainment of a genuine testamentary intent—only becomes specific rather than general and only acquires meaning in an ultimate legal sense in relation to the pertinent and material facts gathered, presented to the courts, considered, interpreted, and evaluated by the courts.

The foregoing is only prelude to pointing out that it is the function of the trial courts to consider, interpret, and evaluate pertinent and material facts *in any given law suit.* Stated somewhat conversely, it is not the prerogative, nor are the appellate courts equipped to perform, the indicated significant functions of the trial courts. Most certainly an appellate court should not literally substitute its own personal judgment for that of a trial court in the interpretation and evaluation of facts. It is now hornbook law, or at least should be recognized as such, that the findings of fact of the trial court will not be disturbed on appeal if supported by substantial evidence. Will contests are no excep-

tion. These legal principles are tersely and unequivocally summarized in the following language of Foster, J., writing for the court in *In re Estate of Kleinlein*, 59 Wn.2d 111, 113, 366 P.2d 186 (1961): "*[o]ur sole power is to ascertain whether the findings are supported by substantial evidence. The weight and credibility of the evidence are for the exclusive determination by the trial court.*" (Italics mine.) The majority glosses over, and in so doing does violence to, this basic premise. In this respect, I disagree with the majority as strongly as possible.

My further disagreement with the majority relates to the significance of the burden of proof factor. The facts as seen by the trial judge in the instant case, and as I also see them, establish a confidential relationship as between the testatrix, the attorney who prepared her deathbed will, and the beneficiaries under that will. *A rebuttable presumption of undue influence arises* from the proof of a confidential relationship between a beneficiary and a testator, plus proof of activity on the part of the beneficiary in the preparation of the will; and when that proof is made sufficient to give rise to such presumption, *the burden is on the beneficiary to show that the will was not procured by his undue influence.* Whether the presumption is overcome is a question for the trier of fact. *See In re Estate of Hall*, 158 Cal. App. 2d 466, 322 P.2d 1011 (1958). The majority brushes these legal principles aside. Their applicability and dispositive thrust are simply ignored in this will contest. In like manner, the majority assumes or preempts plenary and arbitrary judicial authority to dispense with the findings of the trial court. Apparently seeking some solace in administering the *coup de grace* to the findings and to the hitherto recognized appropriate functions of the trial court, the majority resorts to a hoary but patently transparent legalism, *i.e.*, the clear, cogent, and convincing test. This so-called test, in my opinion, is simply a phrase of art—lacking in substance and without legal significance other than may be attributed to it on a case-to-case and totally on a subjective rather than objective basis. Indeed, the clear, cogent, and convincing phrase, like beauty—as defined by a sometime

poet-philosopher—is largely in the eyes of the beholder. Stated forthrightly and unequivocably, the clear, cogent, and convincing phrase, in my opinion, is a conceptualism conceived and dedicated to the propagation of purely subjective value judgments and their legal implications. In other words, the meaning of this legal phrase, as said of yore, is "measured solely by the length of the chancellor's foot." Assuming only for the purpose of argument that the clear, cogent, and convincing phrase has some substantive or possibly even slightly objective validity, the *Kleinlein* case, *supra,* states and clearly holds the weight and credibility of the evidence is for the trial court in will contests. If the clear, cogent, and convincing phrase fits into any recognized legal category, it is that category regarding "the weight and credibility of the evidence." Again, *Kleinlein* clearly and irrevocably stands for two propositions: (1) the trial court determines the weight and credibility of the evidence, and (2) that we do not try will contests de novo at the appellate level. At most, it may be said that our function on appeal is not to examine the disputed evidence de novo; rather, our function is to determine whether there is *substantial evidence* to support the findings, conclusions, and judgment of the trial court.

Additionally, I cannot agree with the majority's disregard of the significance of the contesting niece and nephew as the natural objects of the testatrix's bounty. The law has long favored construction of wills favoring those who would inherit under intestate laws. *See, e.g., In re Estate of Tipps,* 54 Wn.2d 585, 343 P.2d 566 (1959); *In re Estate of Levas,* 33 Wn.2d 530, 206 P.2d 482 (1949). It seems obvious to me that this concern should be given equal recognition where those natural objects of the testatrix's bounty are disinherited by means of a deathbed will.

What was the genuine or controlling testamentary intent in the instant case? Was it that evidenced in two carefully prepared previous wills, and as expressed by a woman in robust health with an unquestionably astute mind, or was it that supported essentially by a document hastily prepared for and signed by a mortally ill woman at a time

when she was obviously physically and mentally exhausted, and under extreme duress from a potential beneficiary to whom she was beholden for all physical and virtually all other needs? A most experienced, competent, and impartial trial judge found no genuine testamentary intent evidenced by the deathbed will, and for this reason voided that will. In a protracted trial, skillfully and competently handled by counsel for each side, this trial judge had the opportunity at firsthand—personally and in open court—to hear and to observe numerous witnesses and to evaluate their testimony in terms of reliability. On the crucial question of the existence or nonexistence of a genuine testamentary intent, he characterized the testimony of the key witnesses of proponents of the will as incredible—in fact, unworthy of belief. Based upon a careful review of the voluminous record, I cannot disagree with him. Furthermore, I do not think this appellate court should do so by substituting de novo its evaluation of the evidence and its findings of fact for those of the trial judge.

It is a fundamental jurisprudential concept that the trial court's findings of fact, where supported by substantial evidence, will not be disturbed on appeal:

> *It is possible,* as plaintiff seeks to do on this appeal, *to diminish* or enhance *the weight* to be attached to various evidentiary facts . . . *and thereby reach a result contrary to that reached by the trial court. This, however, is not our function on appellate review of the question presented. Our function begins and ends with ascertaining whether the challenged finding of fact, as entered by the trial court, is supported by substantial evidence and, if so, whether the findings as a whole sustain the challenged conclusion of law. Stringfellow v. Stringfellow,* 56 Wn.2d 957, 350 P.2d 1003, 353 P.2d 671 (1960); *Tremlin v. Tremlin,* 59 Wn.2d 140, 367 P.2d 150 (1961).

(Italics mine.) *Hollingbery v. Dunn,* 68 Wn.2d 75, 82, 411 P.2d 431 (1966). An obvious corollary to this function of appellate review is the recognition that questions involving the credibility of witnesses is a function singularly within the competence of the trial court. The demeanor, poise and sincerity of the testifying witness all vanish in the static

pages of the trial transcript. The transcript, at most, presents only remote and shadowy, attenuated or secondhand indicators of the character and reliability of the witnesses at the trial of the will contest.

Where, as in the instant case, there is a wealth of conflicting evidence on critical factual questions by interested witnesses, unquestionably, the problem presented *is credibility*. Determination of the credibility of witnesses and the weight of their testimony is a matter *exclusively* within the competence of the trial court. As mentioned before, an appellate court is not equipped, and as a matter of long-standing decisional law, cannot pass on the credibility of witnesses. *See Davis v. Bader,* 57. Wn.2d 871, 360 P.2d 352 (1961); *Anderson v. Kurrell,* 28 Wn.2d 227, 182 P.2d 1 (1947); *Speckert v. Bunker Hill Arizona Mining Co.,* 6 Wn.2d 39, 106 P.2d 602, 131 A.L.R. 125 (1940). Particularly where testimony is *flatly contradictory,* and the trial court might have found for either side, the appellate court cannot set its judgment of the credibility of witnesses *against* that of the trial judge who heard and saw the witnesses, and was in a better position to determine the weight of the evidence. *Oium v. Fillion,* 129 Wash. 37, 223 P. 1060 (1924). Issues of credibility in will contests are subject to the same jurisprudential principle. To repeat: in will contests involving a real and substantial conflict of evidence on the issues of fact involved, the trier of fact is the sole judge of the credibility of witnesses and the weight of the evidence. *In re Estate of Washington,* 116 Cal. App. 2d 139, 253 P.2d 60 (1953); *In re Estate of Merrick,* 93 Cal. App. 2d 624, 209 P.2d 666 (1949).

The majority, in totally disregarding these basic principles of review, cavalierly usurps the functions of the trial court. Whether this be done with great subtlety and skill or more bluntly and openly, the result is the same. It is inescapable that the majority, in its disposition of this appeal, arrogates to itself a basic and well-established function of the trial courts of this state; *viz.,* resolution of conflicting factual testimony premised on the credibility of witnesses.

If the position of the parties was reversed and if the

relatives of the testator or any other person, for private gain or strictly private or personal purposes, had used the same techniques as were used in this case to induce the testator to drastically change a will carefully prepared with the assistance of competent legal counsel—trusted and personally selected by the testator—I firmly believe there would be little hesitation in holding that such techniques constituted undue influence. I fear the majority may be impressed too much by the underlying charitable motives of the purported new beneficiary—which in one sense are highly commendable—if the personal interests and rights of Miss Reilly's *only relatives* may be forgotten. There is no doubt that the new beneficiary is a very worthy charity and that there was no "garden variety" venality involved in the ceaseless pressure to get this elderly and desperately ill woman to make a new will. But, the law does not recognize the subjective worthiness of underlying motives which may encourage acts of undue influence nor does the law recognize the relative worthiness of competing beneficiaries. Nevertheless, the motives and the worthiness of the Order of the Sisters of Charity seem to be a premise or cause—if not the unstated rationale—of the majority opinion.

However much we, as individuals, may respect the worthiness of the nursing home, the law can have only one concern: do the facts as shown by the evidence support the decision of the trial court that there was undue influence. I believe that the following analysis and examination of the record will show that the trial court was unquestionably correct in finding that there was undue influence.

The opinion in *Dean v. Jordan,* 194 Wash. 661, 79 P.2d 331 (1938), suggests a format or model which may be helpful for purposes of orderly analysis and evaluation in the instant case. The format of *Dean v. Jordan, supra,* focuses first on those facts which tend to raise a suspicion of undue influence, namely:

(1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of

the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will.

### Confidential Relationship Involved

The majority opinion displays some considerable confusion as to the legal significance and effect of the relationship between Miss Reilly and the Sisters of Charity as the beneficiary under the Corrigan will. The trial court had no difficulty in finding and stating that the relationship "was one of a confidential and fiduciary character." In positing and then focusing solely on the one separate and distinct legal concept—the fiduciary aspects of the relationship between Miss Reilly and the purported beneficiary—the majority fails to distinguish and, more importantly, fails to recognize the *legal significance* of the more relevant *confidential relationship*.

The effect of a confidential relationship is aptly shown in W. Bowe & D. Parker, 3 Page on Wills 590 (1961):

> If confidential relations are shown to exist between the testator and the beneficiary, slight evidence of additional facts may shift the burden to the beneficiary.

In support of this proposition the learned authors cite *In re Estate of Jaaska,* 27 Wn.2d 433, 178 P.2d 321 (1947).

What are these relationships, described as "confidential," which have the effect of shifting the burden of proof in a will contest involving undue influence? The authorities in the area almost invariably suggest that they include at least the three relationships involved in this case. The first of these is that vis-a-vis a testator and one providing medical aid. *See* W. Bowe & D. Parker, 3 Page on Wills 634 (1961):

> The physician *and nurse* of testator stand in a relation of peculiar trust and confidence to the testator, especially when the will is made in his last sickness.

(Italics mine.) *See also* T. Atkinson, Handbook of the Law of Wills 550 (1953). This confidential relationship has been upheld in Washington. *See Foster v. Brady,* 198 Wash. 13, 86 P.2d 760 (1939), wherein the court repeated the quotation from *Dean v. Jordan,* 194 Wash. 661, 79 P.2d 331 (1938), and then said:

> In the case at bar, we find all the elements suggested in the foregoing quotation—the testator of great age and *very ill, suffering from a mortal disease; the beneficiary* occupying the relation *not only of physician but of custodian, and actively participating in the procurement of the will, receiving thereunder an unnaturally large proportion of the estate, to the practical exclusion of the testator's nearest living blood relative,* for whom he had always manifested affection, *and whom he had remembered much more substantially in a prior will.*

(Italics mine.) As pointed out previously, the fact that Sister Joseph was not motivated by personal avarice, while possibly relevant from a moral or religious viewpoint, is irrelevant to the legal question of undue influence.

The authorities recognize a second category of confidential relationship, *i.e.,* spiritual adviser. *See, e.g.,* W. Bowe & D. Parker, 3 Page on Wills 637 (1961):

> A spiritual adviser is ordinarily in a relation of peculiar confidence toward his congregation or parishioners. Accordingly, as in other cases of those *in confidential relations, undue influence may be inferred as a presumption of fact from the additional circumstances that such adviser drew the will or procured it* to be drawn.

(Italics mine.) Many states have recognized a high danger of abuse, however well intended, of this particular kind of confidential relationship and have enacted modern Mortmain statutes or have otherwise restricted charitable bequests in anticipation of death. *See* W. Bowe & D. Parker, 1 Page on Wills 104 (1961). Other states have adopted a more flexible case-by-case approach, placing a heavy burden upon the proposed beneficiary when a confidential relationship exists.

The nature of the evil sought to be prevented by restric-

tions on charitable bequests in anticipation of death has been clearly stated:

At common law, a gift to charity by will was not invalid although made shortly before death. It has long been considered in accordance with sound public policy, however, to guard against those improvident dispositions by last will and testament which are so often *the result of a weakened mental condition, due to severe illness,* and the fear that comes to many in the hour of death, and to prevent testators who may be laboring under the apprehension of impending death from disposing of their estates *to the exclusion of those who are, or should be, the natural objects of a testator's bounty.*

(Italics mine. Footnotes omitted.) 15 Am. Jur. 2d *Charities* § 23, at 28. Another writer has noted that:

Undoubtedly the reason for [modern Mortmain statute] time periods is that a testamentary gift given in a will made a considerable period prior to the testator's death, at a time when he is not motivated by a deathbed fear of hell and the need of purchasing heavenly bliss, is not as likely to be improvident as a charitable gift influenced by the fear of death, purgatory and the impending judgment. Obviously the law feels that whereas natural affections of a man for his family should normally be allowed to compete freely with other motives and influences vying for his generosity, *such competition becomes unfair and should be restricted during a period shortly preceding death.*

(Italics mine. Footnotes omitted.) 1 Page on Wills § 3.16, at 108 (W. Bowe & D. Parker rev. 1960). Where a confidential relationship, such as that evidenced in the instant case, exists, it is incumbent upon the proposed beneficiary under the deathbed will to rebut a clear inference of abuse of the relationship where those who are the natural objects of the testator's bounty are disinherited. It is clear to me that the nieces and nephew of Miss Reilly were the natural objects of her bounty. While authorities are in disagreement as to the precise meaning of the phrase "natural objects of the testator's bounty," I would adopt the statement that the term comprises those persons who would take in the absence of a will. Such persons are those whom intestacy

statutes have so designated to take and, under most, if not all, modern intestacy statutes recognize the status of near relationship. *See Page v. Phelps,* 108 Conn. 572, 143 A. 890, 893 (1928); *In re Estate of Walther,* 177 Ore. 382, 163 P.2d 285 (1945). *But see In re Estate of Nolan,* 25 Cal. App. 2d 738, 78 P.2d 456 (1938). Historically, the concept of testate disposition of property is not traceable to the desire of testators to distribute their property among friends or charities. Rather:

> The will has been called "an accidental fruit of feudalism" in the respect that the feudal doctrine of primogeniture, whereby all real property descended to the oldest son of the owner upon the latter's death, created the occasion and desire for a testamentary disposition to avoid the harsh consequences of the doctrine by providing for an equitable division of the property of a decedent *among those having equal claims by virtue of equal kinship.*

(Italics mine. Footnotes omitted.) 57 Am. Jur. *Wills* § 3, at 42. In this light, I am convinced that the better view equates "intestate takers" with those who are "the natural objects of the testator's bounty."

*In re Estate of Bourquin,* 161 Cal. App. 2d 289, 326 P.2d 604 (Dist. Ct. App. 1958), presented a fact situation strikingly similar to the instant case. An elderly woman with an apparently terminal illness entered a rest home operated by a religious organization. While there, she allegedly decided that she wanted to make a new will, *disinheriting the closest relatives* and leaving most of the money to the home. The woman in charge called an attorney *who had provided legal services to this home in the past.* He hastily prepared a will leaving the bulk of the estate to the home. The trial court held that the nursing home personnel and attorney were in a confidential relationship with the decedent, that there was undue influence, and denied the new will admission to probate. Instead, the previous will was admitted to probate. The appellate court upheld the decision of the trial court and engaged in an extended discussion of the confidential relationship involved.

Another very similar case is *Muller v. St. Louis Hosp. Ass'n*, 5 Mo. App. 390, *aff'd*, 73 Mo. 242 (1878). *Muller* also involved a terminally ill patient at a religious medical institution who was encouraged by a priest to make a will leaving a substantial bequest to the institution. The court, noting the presumption against a will made in favor of a professional adviser, stated:

> The same reasons exist, with at least equal force, in regard to a will, *made in extremis, in favor of one's spiritual adviser, or of a religious institution within whose walls the patient lies,* and whose ministers are assisting in a professional capacity at his bedside.
> . . . The intention of all parties may have been disinterested and praiseworthy to a high degree, in a religious and moral point of view, and the will may, nevertheless, be void for legal fraud.

(Italics mine.) The court continued showing other factors to be considered:

> The facts that the will was made several days before death actually occurred; that the patient rallied and lived a week, during which time he expressed no wish to change it; and the fact that his friends had at all times free access to the dying man, are highly in favor of the will. But against these the jury might set the fact that *he never alluded to the will after its execution, and gave directions concerning his property, not to the executor, but to an intimate friend, as if no will existed.* This circumstance tended to show that he had forgotten the will as soon as made, or did not know what he was about when he signed it.

(Italics mine.)

There is a third relationship which is uniformly held to be a confidential relationship casting suspicion of undue influence upon a will. This is the attorney-client relationship. Although perhaps insufficient in and of itself, the fact that Corrigan had been the longtime legal adviser to the nursing home and was procured by the home to draw the will clearly shows, at best, divided loyalties between the home and his other client, Miss Reilly. *See In re Estate of Beck*, 79 Wash. 331, 140 P. 340 (1914), wherein the court said that the fact that the "beneficiaries procured an attor-

ney to draw the will, if it be a fact, was material . . . upon the question of undue influence." *See also Mc-Cutcheon v. Brownfield,* 2 Wn. App. 348, 467 P.2d 868 (1970).

## ACTIVE PARTICIPATION BY BENEFICIARY IN PREPARING AND PROCURING WILL

Sister Joseph of Arimathea was Miss Reilly's supervising nurse. She is a member of the Sisters of Charity and a registered nurse. As will be shown, the evidence at trial indicated a persistent effort to have Miss Reilly make a will in favor of the Sisters of Charity. Mrs. Oden, a nurse's aide at the home testified that shortly before Miss Reilly's arrival, the Sister told her that "we were getting in a real rich woman, and that we must be nice to her; and she may will the home some money." Mrs. Oden also testified that in February she overheard a conversation between Sister Joseph and Miss Reilly which went as follows:

A She [Sister Joseph] said, "Miss Reilly, you must make your will," and she repeated it several times. Q Did Miss Reilly say anything in response to that? A No, she didn't answer her at all.

Mrs. Troxell, another member of the floor staff at the home noted that the Sister said to her:

We have a guest coming in to be put in the front bedroom. She is a rich woman. I want you all to be very good to her, treat her with great respect. She has money and maybe she will leave us some money.

As noted by the majority, this "rich woman" was indeed treated very well. She was given extraordinary service, fine china, and even a special room redecorated to conform with Miss Reilly's every desire. The home spared no effort in the attempt to get Miss Reilly to "will the Home some money." Some of the most persuasive testimony in this regard is that of Father Galvin, Miss Reilly's chaplain at the home. His testimony is as follows:

Q My question is this: At any time did Sister Joseph tell you that she, Sister Joseph, asked Miss Reilly to leave money to the home in her will? A Well, in an indirect way by the way she spoke. Indirectly. She said, "Why

don't you ask her?" That would mean she asked, do you see. Q Did she ever tell you that she herself had asked Miss Reilly? A She didn't come out and say, "I asked," not that way, but she said, "Well, why don't I ask her? We could do a lot of good." So I concluded she did ask it.

The majority argues that all of this was mere concern to get Miss Reilly *to make a will*, inferentially on the assumption that *she had no will*. However, it is clear that Sister Joseph was aware of the previous disposition of the estate in Miss Reilly's prior wills, and continually sought to have Miss Reilly make *a new will* designating a different beneficiary—The Sisters of Charity. Thus, the effort and objective involved considerably more than the mere attempt to get Miss Reilly to make *a* will. Indeed, it was designed to cause Miss Reilly to *disinherit* her nieces and nephew, and to will her estate to the home. Three days before the Corrigan will was executed, the Sister remarked to Mrs. Nelson, "You know, we have a project going on here, an experimental project, and in the neighborhood of $14,000.00, and *we need this money very badly, much more so than nieces and nephews.*" (Italics mine.) Several weeks later the Sister acknowledged the success of her persistent strategy, remarking to Mrs. Troxell, "Well, *we finally got Miss Reilly* to make out a will." (Italics mine.)

### THE UNNATURAL NATURE OF THE SUDDEN CHANGE IN TESTAMENTARY PLANS

The majority opinion goes to some considerable lengths to describe litigation between Miss Reilly and her half brother antedating her death by almost half a century. The apparent purpose of this discussion is to demonstrate that she was deeply hurt by the episode. However, there is no testimony that she bore her half brother any enmity either at that time or subsequently. Indeed, the portion of Miss Florence Mollan's testimony which the majority omits from her quoted testimony notes that "Josephine never seemed bitter. She was always kind and generous and good." Miss Mollan also testified that, with reference to the half brother, Miss Reilly "wanted no hard feelings; only

peace." Curiously, the majority omits this testimony. The majority conjectures that Miss Reilly would not want her estate to go to the children of her half brother. This conjecture completely ignores one important factor which clearly negates Miss Reilly's alleged animosity toward her half brother; *viz.,* in the will made by Miss Reilly in 1945, and again in the will made by Miss Reilly in 1954, *the nieces and nephew were the beneficiaries.*

It should be remembered that the prior litigation over the will of Dr. Reilly occurred in 1929. It should further be remembered that both Frances Reilly Estill and John Reilly lost contact with Miss Reilly sometime in 1934 (perhaps explainable by the fact that between 1931 and 1935, Miss Reilly moved a total of four times—from Chicago to San Diego; from San Diego to Texas; from Texas to Denver; and from Denver to Seattle). In 1945, when Miss Reilly made her first will naming the nieces and nephew as beneficiaries, 16 years had elapsed since the earlier will contest, and 11 years had elapsed since Miss Reilly and her nieces and nephew had lost contact with one another.

After reviewing the Chicago will litigation, and certain statements by Miss Reilly purportedly implying animosity toward her half brother, the majority concludes, at page 648, *supra*:

> In our opinion, the foregoing discussion of the litigation instituted by the half brother against Miss Reilly after the death of their father, in which he accused her of dishonesty in her handling of their father's property during the last years of his life, shows that she was deeply hurt and seriously disturbed by this episode. . . . It was an experience which a conscientious and meticulous young woman would not be likely to soon forget.

The deficiency in this critical reasoning of the majority deserves careful analysis since the above-quoted language forms the basis for the majority's unsupportable conclusion that the Chicago will litigation may be used to explain and support Miss Reilly's deathbed disinheritance of her nieces and nephew—the named beneficiaries in her two previous wills. Such a conclusion cannot stand in light of the facts in

the instant case. The majority reasons sylogistically from an *unstated* major premise that "Persons deeply hurt by relatives are more likely to disinherit *those* relatives than are persons who have not been so hurt." The majority's stated minor premise is that "Miss Reilly was deeply hurt by her half brother." The unstated but clearly inferential conclusion drawn by the majority is that "Therefore, it was natural for Miss Reilly to disinherit her nieces and nephew."

The majority clearly draws too heavy a conclusion for the foundations which it sets. It is a conclusion which is not supported by the facts: (1) Even if one assumes that Miss Reilly did, in fact, hold animosity toward her half brother, *the record is categorically devoid of any indication that this alleged animosity extended to Miss Reilly's nieces and nephew.* Rather, the trial court *found* that "[d]espite the circumstances that prompted [Miss Reilly's] move from the middle West and despite having lost contact thereafter with the petitioners, *decedent continued to consider them her family.*" (Italics mine.); (2) Further, even if one assumes that Miss Reilly's alleged animosity toward her half brother extended to her nieces and nephew, it is incongruous to assume that she would fail to assert this animosity at the earliest possible opportunity—*i.e.,* when preparing her first or second wills—considering her fundamental "Do it now" nature. That Miss Reilly would, instead, reserve this alleged animosity and express it by disinheriting her nieces and nephew some 35 years later, by means of a deathbed will, seems highly improbable. The two earlier wills clearly contradict the unsupported assumption of the majority that an ancient unpleasantness or misunderstanding between Miss Reilly and her half brother still smoldered and carried over years later to her nieces and nephew.

There is no question but that the two previous wills were made without undue influence while Miss Reilly was in good health and in full possession of her faculties and after due consultation with her personal attorney and full consideration of the implications of the wills.

The majority opinion attempts to show that Miss Reilly

had contemplated changing her will. This assumption is based upon either highly ambiguous testimony or testimony which was found by the trial court to be very questionable—in fact, unworthy of belief. As an example, in footnote 2, the majority theorizes, indeed flatly asserts, that "Miss Reilly said that she wanted to change her will." But, the contrary is much closer to reality and truth. The conversation apparently relied upon and attributed to Mrs. Scott, an employee of the Redemptorist Order who was a slight acquaintance of Miss Reilly, actually concerned a request by Miss Reilly that Mrs. Scott witness a gift. Miss Reilly remarked that she wanted her will "taken care of." In view of Miss Reilly's past experience with her father's will and the litigation over unwitnessed gifts prior to death, this concern is quite consistent with a desire to keep the will the same but to have other particular items pass outside the will. Indeed, if Miss Reilly contemplated a major change of beneficiaries, she would have probably waited and incorporated these changes in the new will.

The majority places considerable emphasis on the testimony of Mrs. Heily that Miss Reilly contemplated leaving her estate to a charity. However, during cross-examination, Mrs. Heily said "[Miss Reilly] said charity, whether she said a charity or charity, I can't say." The majority states that "[it] is undisputed that several months before her death Miss Reilly was considering making a new will entirely different from her wills of 1945 and 1954." At best this is an overstatement of a small amount of ambiguous and questionable evidence. The majority relies heavily upon the testimony of Mrs. Anderson and Mrs. Heily, both of whom dedicated a great amount of time and effort to the furtherance of interests of the Sisters of Charity as a possible beneficiary under the "Corrigan" will. The majority also appears to rely on the ambiguous testimony of Mrs. Scott. Despite the assumptions of the majority opinion, Miss Reilly at no time said to anyone that she wanted to change her will, make a new or different will, or change beneficiaries.

But, let us assume that Miss Reilly did plan to change

her will at some point 9 months before her death. (Mrs. Anderson and Mrs. Scott both testified to events taking place in September and October of 1963.) As the majority continually notes, Miss Reilly's temperament was reflected in the slogan "Do it now." Since she was well aware of the terminal nature of her cancer at this time, it is hardly in keeping with her personality and character for her to delay making a new will *if* indeed that is what she intended and wanted to do. It is most significant that Miss Reilly, in fact, did nothing about changing her will until she lay mortally ill. Miss Reilly's propensity for not procrastinating on important matters was a fact apparently believed by the trial court. Again, such a factual determination should not be now disturbed by this court.

The majority insists that the sudden break with Miss Reilly's previous testamentary plan and long-established practice of making charitable gifts was entirely natural. The majority rejects all evidence of Miss Reilly's past charitable gifts with the statement that the contestants would not be benefited by a wider distribution of Miss Reilly's estate to charities. I disagree with this rejection. Even if one assumes, against the weight of the evidence, that Miss Reilly desired to change her will, her past practice is relevant to the question of whether this will, to only one charity, was natural and reflected a genuine intent. Certainly Miss Reilly's past practice is relevant to the question of whether the "Corrigan" will reflects her intent or the intent induced by the representatives of the beneficiary involved. Consequently, a close examination of this past practice is in order.

The bequest to the Sisters in the purported new will amounted to the entire devisable estate. This is in marked contrast to Miss Reilly's giving to the Mount St. Vincent's Home in the period before her entrance into it. In the year 1963, Miss Reilly gave to Catholic charities other than the home the sum of $5,491.25. She gave to the home $110. In 1962 she gave $4,643.15 to the former; $405 to the home. In 1961 she gave $13,424.50 to the former group; she gave $235 to the home. In short, in 1961, 1962, and 1963, the home

received slightly more than 3 per cent of Miss Reilly's giving to Catholic charities.

In 1964, Miss Reilly took up residence in the home. In January she gave $1,050 to other Catholic charities and her parish. In February she gave $1,105 to other Catholic charities; she gave the home gifts of $1,000 and $3,000. In March she gave $1,000 to the Society for the Propagation of the Faith, and a $15 Easter offering to the home. In April she gave a $10 Sunday offering to the home, and a gift of $50 to a friend.

On May 5 Miss Reilly gave $5,000 to the home and $5,000 to Mrs. Nelson. The checks were marked "gift in appreciation." In view of the fact that Miss Reilly received the last rites on May 4, it is reasonable to suppose that she was making gifts to those to whom she felt gratitude for aid and attention. On May 8, the same date as the contested will, Miss Reilly gave $30,000 to the home. On May 5 she had informed Mrs. Nelson that this fund was being transferred to Seattle to be used for the expenses of her last illness.

It appears clear from this record that the home did not become the significant object of any giving on the part of Miss Reilly until after she had taken up residence there, was ill with terminal cancer, and was exposed to the repetitive solicitations of the Sisters.[4] She responded to those solicitations with several munificent gifts. But it cannot be said, at any time prior to the creation of the confidential relationship between the home and Miss Reilly, that the home was shown by any action of Miss Reilly to be a significant natural object of her benefactions.

### OTHER CONDITIONS—AGE, CONDITION OF HEALTH, OPPORTUNITY TO INFLUENCE, ET CETERA

Let us now turn to the events immediately prior to May 8, 1964, the day the will was executed. Miss Reilly's condi-

---

[4] The Sisters testified that no direct solicitations of the guests for gifts were made. However, the home made its needs known to the guests through the Sisters and trusted that this would be persuasive and effective.

tion worsened increasingly during her stay in the home. By early May her terminal cancer was in an advanced state and it was obvious that she could not live much longer. On May 4 she was running a fever of over 101. She was vomiting clear fluid, had lost control of her bowels, and was so exhausted she was unable to raise her head. She received the last rites on May 4. On that same day she fainted on the floor of her room and was not discovered there for almost half an hour. Dr. Reilly noted in the medical records, "Patient is emotionally unreasonable, refusing common sense suggestions."

A fairly extensive hospital medical history of Miss Reilly was available, as well as medical and nursing home notes. This evidence provided the basis of extensive testimony by several medical experts about the medical and mental condition of Miss Reilly on the crucial dates. One of these witnesses was Dr. Alexander Stevens, a clinical associate professor of medicine at the University of Washington, who has written extensively in the fields of hematology (diseases of the blood) and cancers of the lymphatic system. He testified that one having the objective symptoms manifested by Miss Reilly was probably suffering from a serious fluid imbalance, extensive heart and arterial disease, and hypovolemia (reduced blood volume). She also had infections for which she was receiving large doses of penicillin. Dr. Stevens concluded, from ample objective evidence to verify his opinion, that beginning May 4 there was a 6-day period of maximal illness after which she improved a bit before her final decline and death.

Another medical expert, Dr. James Burnell, also teaches medicine at the University of Washington and has developed considerable expertise as a result of his research and teaching in the field of fluid balance problems of seriously ill patients. After reviewing the mass of medical evidence, he testified as follows:

the period of maximal illness, with the possible exception of the few days immediately antedating her demise, was on or about May 8th. I say this because the recorded

pulse rate was the highest on May 8th; the recorded temperature was very nearly the highest on May 8th; the falls, the fainting spells were present largely only immediately before May 8th and many of these functions were apparently improved approximately one to two weeks after May 8th.

He stated that there was a high probability of inadequate cerebral blood flow coupled with extreme fluid imbalance with resultant disordered mental function and a general lassitude. It was his opinion that as a consequence during this critical period Miss Reilly would desire to follow the course of least resistance. A psychiatrist also testified that one afflicted with the physical stress which Miss Reilly was undergoing, and whose character was such as described in the depositions of Miss Reilly's friends, would, if that person's will broke, break suddenly and panic. He characterized susceptibility of one of such character to influence by one in the position of a supervising nurse as "as susceptible as a child-mother relationship . . . almost completely susceptible."

The majority disregards all of the expert medical testimony, citing *In re Estate of Bottger,* 14 Wn.2d 676, 129 P.2d 518 (1942), for the proposition that testimony of physicians who were not present at the time the will was executed is evidence of the weakest sort. In so doing the majority demonstrates the danger of taking language of a court decision out of context with little regard for changing medical technology or the fact pattern in the original case. In *Bottger,* the evidence was offered against the testimony of two outside physicians who had served as disinterested witnesses to the execution of the will after conducting a medical examination of over an hour's duration, comprehending both the physical condition of the testatrix and her memory, orientation, ability to perform mental operations, and knowledge of her affairs. The fact that Cadwell Corrigan did not provide for such independent corroboration is another factor tending to show the highly questionable nature of this will. *Cf., Meyer v. Campion,* 120 Wash. 457, 207 P. 670 (1922).

There is also another significant difference in that there is no indication that the physicians involved in *Bottger* had anywhere near the medical data available upon which to base a diagnosis as did the expert witnesses in the instant case. In a time when specialists are frequently called upon to consult and make a diagnosis at great distances and without the patient's presence, the out-of-hand rejection of such evidence is entirely without basis. It is particularly inappropriate for us as appellate judges, spending great amounts of time making "diagnoses" based upon a partial record and without the "patient's" presence, to deny that skill to other professions. It is ironical that the majority says that only the physician who saw the patient can be relied upon, while ignoring our normal practice of placing particular reliance upon the trial judge because of his ability to examine and understand the testimony and demeanor of the various witnesses.

The majority also attempts to discredit the testimony of the two medical experts with an assertion that they "admitted that their opinions were based either on incorrect assumptions or on incomplete facts." The record does not support this assertion. Cross-examination simply demonstrated the obvious—both medical experts were testifying on the basis of medical records or other medical documentary evidence before them. Personal examination and questioning of the patient would have been helpful but was not a sine qua non. One of the experts stated that the latter kind of information would increase his degree of certainty in his diagnosis 15 per cent—from 80 per cent to 95 per cent. Thus, absence of this information does not mean that the testimony of the two experts should be disregarded. It is relevant, material, and was to be considered and evaluated by the judge.

On May 5, Miss Reilly had given the home a check for $5,000, bearing the notation "gift in appreciation." On the afternoon of May 8, Miss Reilly drew a countercheck for $30,000 on her account in the Metropolitan Branch of the Seattle-First National Bank. Miss Reilly's handling of her financial affairs was characterized by meticulous attention

to detail. The check which she drew is reproduced below:

It may be noted that the spaces for the drawee bank's name and branch are improperly filled out. The name of the payee is stated as "Mount St. Vincent, Seattle" although Miss Reilly usually made her checks payable to Mount St. Vincent Home for the Aged. Unnecessarily duplicative words of negotiability are used on the payee line.[5] The line stating the amount in words commences with the figures "30" which are inadvertently written in error and then stricken out. The typed language was, according to the testimony of the Sisters, inserted at Miss Reilly's request. At the time that the check was prepared, Sister Margaret Jane, the Sister Superior, contacted Cadwell Corrigan, who was retained as counsel by the home, for advice on how the home should accept this gift.

Somewhat later in the afternoon Sister Margaret Jane again attempted to contact Corrigan. When Corrigan returned that call at about 4:30 p.m., he was informed that Miss Reilly desired to make a will. He was summoned to the home for that purpose and went there immediately.

Corrigan met the Sister Superior, Sister Margaret Jane, in the lobby and was conducted to Miss Reilly's room. Miss Reilly and Corrigan had never met prior to this time. He hurriedly prepared the will upon a stationer's form by inserting a residuary clause comprising the entire estate. The will left the entire estate to the Sisters conducting the Mount St. Vincent Home for the Aged. So hurried was the

---

[5] An alternative reading of the payee as "the [religious] order of Mount St. Vincent, Seattle" explains the unnecessary words of negotiability, but would indicate an even more confused mind than that supposed by the above reading.

drafting that the name of the beneficiary was misstated and Miss Reilly's name was misspelled. Although Miss Reilly was extremely precise in her business affairs and meticulous as to the spelling of her name, she neither read the will (which was read to her by Corrigan) nor detected the misspelling when she signed it. Mr. Corrigan later made a self-serving statement in his deposition to the effect that Miss Reilly told him of her attorney, Mr. Ferguson, prior to the drafting of the will. According to Corrigan, he then offered to call Ferguson. Curiously, the asserted offer to call Ferguson is not corroborated by any of the other witnesses present.

Between 7 and 7:30 that evening, Miss Reilly prepared the note set out below:

This note is further evidence of Miss Reilly's confused mental state. By this note, Miss Reilly purportedly disposed of certain property *immediately after* she had signed the Corrigan will which left her *entire* estate to the home. The trial court found that ". . . after the signing of the [Corrigan will], which left everything to the respondent religious Order, she wrote out a separate document specifying that her rug and mirror be given to the Rest Home . . ." The trial court additionally observed:

. . . [T]here were many other circumstances of suspicion attendant upon the procurement and execution of the instrument of May 8, 1964, here offered for probate, the more important among which were: . . . the failure of the decedent's memory as to . . . (c) the execution of the letter disposing of her rug and mirror . . .

I would concur in the trial court's analysis that this duplicative act is highly significant in indicating a confused mental state; namely, lack of testamentary capacity. Immediately thereafter, she handed a note to Sister Joseph of Arimathea. The note read as follows:

Dear Sister St. Joseph of Arimathea,

My attorney: Mr. Wm H. Ferguson in Room 929 Logan Building – 5th at Union St. Seattle, Wash. Phone: Main 2-1711. His residence 6307-77th N. E. Mercer I. Ad-2-0748.

Over please

My will is filed in Trust Dept. of National Bank of Commerce – (Main Office). My safe deposit box is in National Bank of Commerce. (Main Office) – One key for this safe deposit box is carried on my key ring with other keys.

M. Josephine Reilly

The majority bases its decision that the evidence was not clear, cogent, and convincing upon its determination that there was "no *direct* evidence that either Sister Joseph or the Sister Superior ever suggested to Miss Reilly what provisions her will should contain." (Italics mine.) The lack of direct evidence is not the proper test and never has been. *See In re Estate of Tresidder*, 70 Wash. 15, 125 P. 1034 (1912), wherein the court said "[f]rom the very nature of things, undue influence can rarely be proved by direct evidence." The evidence that was offered unerringly points toward a constant, albeit well-meaning, pressure to have Miss Reilly change her will to benefit the home.

At this point, the testimony of Mrs. Nelson is of great significance. The majority opinion adequately shows the great faith and reliance which Miss Reilly had in Mrs. Nelson. However, there is some misstatement. The majority incorrectly states that Miss Reilly gave Mrs. Nelson a power of attorney on May 10, "limited to depositing dividend checks, drawing checks to pay bills, and making funeral arrangements." The general power of attorney, which was in fact signed on May 5 (before the execution of the Corrigan will), was unlimited and had no such restrictions.

On the evening of May 8, as was her custom, Mrs. Nelson visited Miss Reilly. The majority attempts to characterize the events of this visit as those of a crafty and secretive old woman cleverly evading the probing inquiries of an overly-inquisitive person. The majority even cites an irrelevant 1912 New York case for this amazing factual construction without any basis in the record and in clear contradiction to the factual finding of the trial court. Let us look at what actually happened. Mrs. Nelson arrived somewhat later than usual and asked "Well, how are you?" This was hardly an overly-probing inquiry into Miss Reilly's business affairs. Miss Reilly responded "Oh, my, am I exhausted. I have been signing papers all day. *I don't know what I have signed.* I hope I have signed the right thing." (Italics mine.) The trial court found that this statement was exactly what it appears to be—a lament from an exhausted, confused, desperately ill elderly woman who had

no idea what she had been signing. The majority cites no authority for its newly found power to disregard that finding.

The record also indicates a rather suspicious turn in the chain of entries in the nurses' record at the home. Prior to the signing of the will, Miss Reilly had been described as "extremely weak" (May 4), "very uncooperative" (May 5), and "very weak" (May 6). On May 7, the entry—crowded in at the end of the line and admittedly written at a different time—reads like a legal conclusion, "very alert and conscious." On May 9 another self-serving statement continued: "her mind very clear . . . always rational and definite of what she wants or not wants."

On May 11 Sister Joseph sent Cadwell Corrigan the note she received from Miss Reilly in which Miss Reilly identified her attorney and her will. Although the note, addressed to Sister Joseph, identified another attorney as her attorney and another will as her will, Corrigan did *absolutely nothing about this apparent confusion* and merely filed the note. The majority attempts to explain the note as actually intended for Corrigan to aid him in his work as administrator. However, the record is devoid of any finding as to when the note was actually written. And, if one accepts the statement that the note given to Sister Joseph was intended for Corrigan, there is no reason given for the wording of the note which omits any reference to Corrigan or the new will. There is also no explanation advanced to show why Miss Reilly supposedly waited until immediately after Corrigan had left the home to send him the information which an administrator would need. In my opinion the somewhat strained hypothetical explanation offered by the majority is not enough to overcome the clear meaning of this evidence on its face.

## Conclusion

All of the above tends to show the various suspicious circumstances involved which raise a presumption of undue influence. Briefly summarized, again using the format adopted in *Dean v. Jordan*, 194 Wash. 661, 79 P.2d 331

(1938), they are (1) the confidential relationship involved; (2) the beneficiary unquestionably actively participated in the preparation and procurement of the will through constant pressure and the use of its own attorney to draft the will; and (3) the rest home received *all* of the estate, which is unusual and unnatural in view of the prior wills and past charitable practices of the decedent. The other considerations enumerated in *Dean v. Jordan, supra,* which serve to strengthen the presumption are present in this case also. Age, terminal illness, serious question of mental competence, and the disinheritance of the only blood relatives with no apparent reason for this change in testamentary plans all point toward undue influence. When this is coupled with the suspicious circumstances surrounding the signing of the will, the close confidential relationship giving great opportunity for exerting undue influence and the sudden change in charitable giving which took place after the confidential relationship was established, the presumption of undue influence becomes inescapable. I would hold that the presumption of undue influence has been established.

Did the proponents of the will come forward with sufficient evidence to balance the scales against the presumption? The record is replete with testimony—but that testimony is from the Sisters, from the employees and nurses in the home, and from Dr. Reilly (who, in addition to being Miss Reilly's physician, was also an attending physician at the home). Evaluation of that testimony was the province of the trial court. That court found the testimony of Sister Joseph to be incredible and that of the Sister Superior and Dr. Reilly to be so suspicious as to be entitled to little weight.

What little disinterested direct testimony there was in this case and the objective evidence contained in Miss Reilly's writings and the quantitative items in the nursing records was squarely contradictory to the testimony of the Sisters and Dr. Reilly as to Miss Reilly's condition on May 8.

The deposition of Cadwell Corrigan raises particular problems. The majority disregards the finding of the trial

court that Corrigan's testimony also was incredible. This decision is based upon our rule that an appellate court is in as good a position as the trial court to weigh purely documentary evidence. I question whether this rule is properly applied when a document is being weighed and evaluated against a great amount of in-court testimony from many witnesses. In the latter case, the trial judge is still in a unique position to evaluate the totality of the evidence. But even if it be assumed that his finding is to be disregarded, I cannot help but agree with the conclusion of the learned trial judge. Let us evaluate the position of Cadwell Corrigan.

It will be recalled that Cadwell Corrigan and Miss Reilly were strangers until they were introduced by the Sister Superior. Corrigan was employed by the home as its attorney and was on a monthly retainer. When summoned to the home he was confronted with an elderly woman in extremis. She was in a feverish, weak, and bedridden condition. She had to be assisted into a sitting position to sign the will. The Sister Superior who had summoned him had told him nothing concerning the state of Miss Reilly's health or the imminence of her death. Although Corrigan was on retainer from the home, he did not disclose this fact to Miss Reilly. According to him, she volunteered the statement that she had a considerable estate, that her relatives were likely to be disappointed in the proposed new will, and there might be trouble. Although he was thus apprised of the possibility of a will contest, Corrigan took no steps whatever, such as obtaining independent subscribing witnesses or a medical examination to clearly establish the facts as to undue influence or testamentary competence. Let us assume that Corrigan was so fearful of his client's immediate demise that he felt it necessary to prepare a hasty handwritten will initially. Miss Reilly survived almost a month after May 8, and it is clear from the record that her condition rallied somewhat after that date. There is no evidence in the record for the continued inaction on the part of Corrigan. Professional responsibility would seem to require that he replace the initial will with one

carefully prepared and properly corroborated as to testamentary capacity and intent at the earliest opportunity.

On May 11, Corrigan received the note addressed to Sister Joseph which is set out above. Although the note was undated, it refers to Mr. Ferguson as the testatrix's attorney in the present tense, speaks of a former will as the testatrix's will, and names the National Bank of Commerce (main branch) as the testatrix's executor, whereas the will Corrigan had drafted named Corrigan as executor. Receipt of such a communication by a lawyer for a very ill, elderly person within 3 days of drawing a will indicates a clear ambiguity as to the testamentary intent of the testator, and raises a duty of inquiry on behalf of counsel into his client's testamentary intent and capacity.

Corrigan made no inquiries whatever of Miss Reilly, or the executor under the previous will, or Miss Reilly's previous counsel. Such inaction occurred in the face of a clear conflict of interest between his duty to Miss Reilly and his retainer from the home. It is absolutely clear that Corrigan violated Canon 6 of the Canons of Professional Ethics in not making a full disclosure to Miss Reilly of his relationship to the home and in not making a full and complete inquiry into Miss Reilly's testamentary capacity and any possibility of undue influence before drawing her will in favor of the home which retained him as its counsel.

The trial court characterized his conduct as so far below the minimal standards required of a practicing attorney that it required no further comment. I agree with that evaluation and the characterization of his testimony as incredible.

In my opinion, the decision of the trial court can and should be upheld even if one accepts Corrigan's testimony at face value or goes further and rejects the presumption of undue influence. Even in the absence of the presumption, I believe that the evidence of undue influence is clear, cogent, and convincing.

There remains the question of the cross appeal, which actually involves three separate orders: the awarding of fees to the estate of Cadwell Corrigan; the awarding of fees

to his successor, Richard J. Corrigan; and the order concerning the expenses of defending the will contest.

I have some serious misgivings on this cross appeal in view of Cadwell Corrigan's role in the preparation of the deathbed will. I have serious reservations as to whether he was entitled to be compensated either as executor or as attorney for the estate. Had I been the trial judge, I might well have denied fees in this connection. However, I defer to the trial judge's discretion, judgment and conclusion in this matter.

The next issue which must be faced is whether Cadwell Corrigan's breach of loyalty may be attributed to his successor as administrator de bonis non, with will annexed, Richard J. Corrigan to Richard Corrigan's attorneys, and to the counsel, retained originally by Cadwell and subsequently by Richard, who defended the will of May 8.

In this regard it must be noted that the trial court found that Richard J. Corrigan continued the defense of the will in good faith and faithfully performed his duties as administrator. Richard Corrigan was not a party to Cadwell's misconduct. He accepted appointment to administer what, at the time, was a valid will. His conduct of the administration of the estate would have had to have been performed by someone, and there is no showing of any misconduct personal to him. It follows that the portion of the order of April 7, 1967, establishing reasonable compensation of Richard J. Corrigan and his attorney at $4,000 and $12,000 respectively was correctly affirmed.

There remains the question of the expenses of the will contest. It is true that the attorneys defending the will were originally retained by Cadwell Corrigan. It is also true that, had Richard Corrigan abandoned those attorneys and sought new counsel, substantial duplication of effort would have been necessitated to properly defend the will.

It may be observed that this will was defended most zealously. The defenders of the will owed to their client entire devotion and warm zeal in the defense of his cause. The expenses allowable in a will contest brought in good faith are the reasonable expenses of the defense of the will.

Such reasonableness depends upon the going rate for what was done and upon the necessity for doing what was done.

The experienced trial judge was in a much better position than members of this appellate court to pass on this as well as other aspects of this will contest. Consequently, I accept the inquiry made by him as sufficient and would affirm his judgment as to the award to counsel presenting the defense of the Corrigan will.

I would affirm the decision of the trial court.

HUNTER, C. J., and HAMILTON, J., concur with FINLEY, J.

SHARP, J. (dissenting)—In view of the length of the majority opinion (which in turn necessitated an unduly lengthy dissent), an observation on the scope of Supreme Court review in will contests seems appropriate. At one time will contests were tried de novo by this court. Fortunately, the rules have been changed, and now our function is to ascertain whether the findings are supported by substantial evidence. *In re Estate of Kleinlein,* 59 Wn.2d 111, 366 P.2d 186 (1961). As Justice Weaver stated in the will contest *In re Estate of Dand,* 41 Wn.2d 158, 247 P.2d 1016 (1952):

> This case is a striking example of the wisdom of our rule that the trial court, having the witnesses before it, is in a better position to arrive at the truth than is the appellate court.

My examination of the record discloses substantial evidence to support the findings of fact and conclusions of law of the trial court. For that reason I would affirm.

July 9, 1971. Petition for rehearing denied.